## MORGAN & Another *v.* UNITED STATES.

## UNITED STATES *v.* MANHATTAN SAVINGS INSTITUTION.

## VON HOFFMAN & Another *v.* UNITED STATES.

## UNITED STATES *v.* MANHATTAN SAVINGS INSTITUTION.

APPEALS FROM THE COURT OF CLAIMS.

Argued January 12, 1885.—Decided March 2, 1885.

The ruling in *Texas* v. *White*, 7 Wall. 700, that the legislature of Texas, while the State was owner of the bonds there in suit, could limit their negotiability by an act of legislation, with notice of which all subsequent pur-

chasers were charged, although the bonds on their face were payable to bearer, overruled.

The ruling in that case, that negotiable government securities, redeemable at the pleasure of the government after a specified day, but in which no date is fixed for final payment, cease to be negotiable as overdue after the day when they first become redeemable, limited to cases where the purchaser acquires title with notice of the defect, or under circumstances discrediting the instrument, such as would affect the title of negotiable demand paper purchased after an unreasonable length of time from the date of the issue.

The distinction between redeemability and payability commented on in that case embraces and defines the five-twenty bonds in suit in this case.

Holders of government bonds must be presumed to have knowledge of the laws, by authority of which they were created and put in circulation, and of all lawful acts done by government officers under those laws.

The obligations of the United States under the five-twenty bonds, consols of 1865, are governed by the law merchant regulating negotiable securities, modified only, if at all, by the laws authorizing their issue.

The five-twenty consols of 1865 on their face were "Redeemable at the pleasure of the United States after the 1st day of July, 1870, and payable on the first day of July, 1885." In conformity with provisions of law, notice was duly given, as to the bonds of this class in suit in these actions, that in three months after the date of such notice the interest on the bonds would cease. *Held,* That the exercise of the right of redemption made the bonds payable on demand, without interest, after the maturity of the call, until the date for absolute payment.

Ordinary negotiable paper payable on demand, is not due without demand until after the lapse of a reasonable time in which to make demand.

What is reasonable time in which to demand payment of negotiable paper payable on demand, depends upon the circumstances of the case and the situation of the parties.

A holder of a called five-twenty consol could without prejudice, except loss of interest, wait without demand, for the whole period, at the expiration of which the bond was unconditionally payable.

In stamping upon these bonds the faculty of passing from hand to hand as money, and in conferring upon the Secretary of the Treasury the power to receive them in payment, in the great exchange of bonds by which the annual interest on the public debt was reduced, it was intended to leave with the called bonds the character of unquestioned negotiability, and to protect *bona fide* purchasers for value, in the due course of trade, without actual notice of a defect in the obligation or title.

These four cases involved claims against the United States for the payment of certain bonds of the United States, known as "five-twenty bonds," consols of 1865, issued in pursuance of the authority conferred upon the Secretary of the Treasury by the act of Congress approved March 3, 1865, entitled "An Act

to provide ways and means for the support of the government." Twenty bonds of the denomination of $1,000 each and sixteen of $500 each were embraced in the suits. The controversy related to the title only, all of them being claimed by the Manhattan Savings Institution, and ten of each denomination by J. S. Morgan & Co., and the others, being ten of $1,000 each and six of $500 each, by L. Von Hoffman & Co. The bonds having been called in for redemption were presented at the Treasury for that purpose by the holders respectively, J. S. Morgan & Co. and L. Von Hoffman & Co., but payment was refused by the United States on account of the adverse claim of the Manhattan Savings Institution, and the claims of the several parties to the proceeds were transmitted for adjudication to the Court of Claims by the Secretary of the Treasury, March 12, 1880, pursuant to section 1063 Revised Statutes. Judgments were rendered by that court in favor of the Manhattan Savings Institution, and against the other claimants respectively. 18 C. Cl. 386. The several appeals brought up all the cases as they stood in the Court of Claims, the United States appealing from the judgment in favor of the Manhattan Savings Institution, the other parties from the judgments dismissing their respective petitions. The controversy was wholly between the claimants, the United States being merely in the position of a stakeholder, not denying its liability to pay to the true owners of the bonds.

The act of Congress, in pursuance of which the bonds in question were issued, being "An Act to provide ways and means for the support of the government," approved March 3, 1865, 13 Stat. 468, ch. 77, provided:

"That the Secretary of the Treasury be, and he is hereby, authorized to borrow from time to time, on the credit of the United States, in addition to the amounts heretofore authorized, any sums not exceeding in the aggregate six hundred millions. of dollars, and to issue therefor bonds or treasury notes of the United States, in such form as he may prescribe; and so much thereof as may be issued in bonds shall be of denominations not less than fifty dollars, and may be made payable at any period not more than forty years from date of issue, or may be

made redeemable, at the pleasure of the government, at or after any period not less than five years nor more than forty years from date, or may be made redeemable and payable as aforesaid, as may be expressed upon their face," &c.

The bonds issued under this act were called the consolidated debt or consols of 1865, because, in addition to the loan of $600,000,000 authorized by it, the Secretary of the Treasury was empowered to permit the conversion, into any description of bonds authorized by it, of any treasury notes or other obligations, bearing interest, issued under any act of Congress.

The bonds themselves, differing only in numbers and denomination, were in the following form:

" 165,120.]                                              [165.120.

" [Consolidated debt.   Issued under act of Congress approved March 3, 1865.   Redeemable after five and payable twenty years from date.]

" 1,000.]                                                [1,000.

" It is hereby certified that the United States of America are indebted unto the bearer in the sum of one thousand dollars, redeemable at the pleasure of the United States after the 1st day of July, 1870, and payable on the 1st day of July, 1885, with interest from the 1st day of July, 1865, inclusive, at six per cent. per annum, payable on the first day of January and July in each year, on the presentation of the proper coupon hereunto annexed.   This debt is authorized by act of Congress approved March 3, 1865.

" Washington, July 1, 1865.                    " J. Lowery,
                                        " *For Register of the Treasury.*

" Six months' interest due July 1, 1885, payable with this bond.

" (Thirteen coupons attached from and including coupon for interest due January 1, 1879, to and including coupon for interest due January 1, 1885.)"

They were accordingly known as five-twenty bonds, being redeemable after five years, but not payable until twenty years after July 1, 1865.

The act of July 14, 1870, " to authorize the refunding of the national debt," 16 Stat. 272, authorized the issue of three classes of bonds, according as they bore interest at the rates of 5 per cent., 4½ per cent. and 4 per cent. per annum, amounting in the aggregate to $1,500,000,000, which the Secretary of the Treasury was, by the second section of the act, authorized to sell and dispose of, at not less than their par value in coin, and "to apply the proceeds thereof to the redemption of any of the bonds of the United States outstanding, and known as five-twenty bonds, at their par value," or, the act continues, " he may exchange the same for such five-twenty bonds, par for par."

By the fourth section of this act it was provided:

" That the Secretary of the Treasury is hereby authorized, with any coin of the Treasury of the United States which he may lawfully apply to such purpose, or which may be derived from the sale of any of the bonds, the issue of which is provided for in this act, to pay at par and cancel any six per cent. bonds of the United States of the kind known as five-twenty bonds which have become, or shall hereafter become, redeemable by the terms of their issue. But the particular bonds so to be paid and cancelled shall in all cases be indicated and specified by class, date, and number, in the order of their numbers and issue, beginning with the first numbered and issued, in public notice to be given by the Secretary of the Treasury, and in three months after the date of such public notice, the interest on the bonds so selected and advertised to be paid shall cease."

By an act passed January 20, 1871, 16 Stat. 399, the foregoing act was amended so as to authorize the issue of five hundred millions of five per cent. bonds instead of two hundred millions, as limited by the act of July 14, 1870, but not so as to permit an increase of the aggregate of bonds of all classes thereby authorized.

During the period from July, 1874, to January, 1879, the Secretary of the Treasury made various contracts, in writing, for the negotiation of five, four-and-a-half, and four per cent. bonds issued under the refunding act of 1870, in Europe and

this country, with associations of bankers and banking institutions in London and New York, which became known as syndicates.

The claimants, J. S. Morgan & Co., were members of such a syndicate, between which and the Secretary of the Treasury a contract was entered into on the 21st of January, 1879. The members of that syndicate were Messrs. August Belmont & Co., of New York, on behalf of Messrs. N. M. Rothschild & Sons, of London, England, and associates, and themselves; Messrs. Drexel, Morgan & Co., of New York, on behalf of Messrs. J. S. Morgan & Co., of London, and themselves; Messrs. J. & W. Seligman & Co., of New York, on behalf of Messrs. Seligman Brothers, of London, and themselves; and Messrs. Morton, Bliss & Co., of New York, on behalf of Messrs. Morton, Rose & Co., of London, and themselves. The subscription was for $10,000,000 of four per cent. bonds of that date, and five millions additional each month until June 30, 1879, when the contract terminated, the proceeds to be applied to the refunding of the public debt, the Secretary of the Treasury agreeing, on receiving each subscription under the contract for not less than $5,000,000, to issue a call for the redemption of United States six per centum five-twenty bonds equal to or exceeding said sum. The syndicate agreed to pay to the Treasury at Washington within the running of such call the amount of four per cent. bonds subscribed for, at par and accrued interest to the date of subscription, in United States gold coin, United States matured coin coupons, coin certificates of deposit issued under the act of March 3, 1863, or United States six per centum five-twenty bonds called for redemption not later than the date of the subscription to which the payment was to apply. It was also agreed that the United States should maintain an agency at London for the purpose of making deliveries of the bonds subscribed for to the parties as they should desire, and the agent appointed for that purpose was authorized by the Secretary of the Treasury to receive the stipulated payment therefor, including the five-twenty bonds offered in exchange.

On October 27, 1878, the Manhattan Savings Institution, a

savings bank in New York, was the owner in possession of the thirty-six United States five-twenty coupon bonds which are the subject of these suits, sixteen for $500 each and twenty for $1,000 each; and on that day, the building in which was its banking-house was entered by burglars, and these bonds, among others, amounting in all to about $2,500,000, were stolen from the safe, without any negligence or want of proper care in their safe-keeping on the part of the officers and servants of the institution.

On July 30, 1878, the Secretary of the Treasury issued a call for the redemption of $5,000,000 of five-twenty bonds, designated by numbers, in which it was stated as follows:

"By virtue of the authority given by the act of Congress approved July 14, 1870, entitled 'An Act to authorize the refunding of the national debt,' I hereby give notice that the principal and accrued interest of the bonds herein below designated, known as 'five-twenty bonds,' of the act of March 3, 1865, will be paid at the Treasury of the United States, in the city of Washington, on and after the thirtieth day of October, 1878, and that the interest on said bonds will cease on that day."

Successive notices of other like calls were issued thereafter from time to time, according to which the dates on which the interest would cease on the bonds designated were from October 30, 1878, to and including March 18, 1879, which calls embraced all the bonds involved in these suits.

The twenty bonds claimed by J. S. Morgan & Co., and the sixteen claimed by L. Von Hoffman & Co., were bought by them, respectively, at different times, during the year 1879, in London, from well-known and responsible parties, the latter purchasing from R. Raphael & Sons, bankers of high respectability in London, dealing largely in United States government securities; but all the bonds when bought, as well by R. Raphael & Sons as by the claimants, had been called for redemption by the Secretary of the Treasury, and designated in one of the notices to that effect, and the call in each case had matured, and the bonds were bought by them, respectively, with knowledge in each case of that fact; but they bought them, in

the due course of their business as bankers, and paid the full market price for them, to wit, par and accrued interest, in good faith, without suspecting, or having any reason whatever to suspect, that the bonds, or any of them, had been stolen by or from any person, or that there was any defect in the titles of the persons from whom the purchases were made, or that the numbers of any of the bonds had been changed, or that the numbers of any of the bonds were not the original and genuine numbers as issued by the Treasury Department of the United States. In point of fact great publicity was given through the newspapers to the fact of the robbery, and some kind of a circular was issued by the Manhattan Savings Institution in regard to it, but it did not appear what its terms were, nor where, nor to whom it was sent. It was also shown that the serial numbers of four of the bonds purchased by J. S. Morgan & Co., and five of those purchased by L. Von Hoffman & Co., had been, in fact, subsequently to the robbery, wrongfully altered, but when, where, or by whom could not be ascertained, and there was nothing in the appearance of the altered bonds, or the numbers when purchased, calculated to excite the suspicion or notice of a prudent and careful man, the alterations having been so skilfully effected that they were only discoverable with the aid of a magnifying glass.

The twenty bonds claimed by J. S. Morgan & Co., were purchased by them for the purpose of making payment to the United States for four per cent. bonds, subscribed for, under the contract entered into with them and their associates, by the Secretary of the Treasury on January 21, 1879, for the negotiation of four per cent. bonds, and to avoid the transmission of gold to settle their accounts with the Treasury Department. They were delivered by the claimants at different times, soon after their purchase, to the officer in charge of the agency of the United States for the refunding of the national debt in London, who received them in payment for four per cent. bonds of the United States, then delivered by him to the claimants, and were by him transmitted to the Treasury Department at Washington for redemption. The Secretary of the Treasury, in consequence of notice of the adverse claim of the

Manhattan Savings Institution, having withheld payment of these bonds, the claimants, J. S. Morgan & Co., in a letter to the Secretary of September 1, 1879, stated the grounds of their claim as follows:

" We would submit that this course is in entire contradiction to the practice of the department hitherto, and in violation of the agreement upon the face of the bonds to pay them to bearer.

" The government has hitherto always paid its bearer obligations, as every other State, company, or individual does, to any innocent holders who had paid full value for them. This we have done for all these bonds, having purchased them in the regular way of business in the market, and even paying a small premium for them to avoid the transmission of gold to settle our accounts with the Treasury in America.

" They had no fixed maturity; they were arbitrarily drawn by the government for payment at the present time; they carried no notice on their face that they were not payable in accordance with their tenor, and the only penalty for not presenting them was the cessation of interest. The analogy drawn from the equities attaching to an overdue note, as carrying notice on the face of non-payment, has consequently no bearing on the case. These bonds are scattered all over Europe, and the notice that they are due frequently does not reach the holder for months, and sometimes years. We buy them in the regular course of our business, nor could we do otherwise.

" If the government were to decide not to pay bonds to bearer of which the ownership is disputed, except after decision of courts, they would do what neither they nor any other government has ever done before. It would prevent dealing in their securities, be a distinct injury to their negotiability, and a loss to the public credit."

The sixteen bonds claimed by L. Von Hoffman & Co. were transmitted by them directly to the Treasury Department at Washington for redemption. It was from letters from the department, written in answer to their letters of transmittal, that they received first the information that the bonds had been stolen, and some of them altered, and learned of the claim

of the Manhattan Savings Institution, as owners, to await the decision of which the bonds were retained by the Secretary in the custody of the Treasury Department.

In addition to, the foregoing facts, found by the Court of Claims, it also found, that " during the period of the refunding transactions under the act of July 14, 1870, many five-twenty bonds of every call were not sent in promptly for redemption, but were held, in this country and Europe, through want of information, or otherwise, until long after the maturity of· the call," and that. "during the period of the refunding transactions of the government under the act of July 14, 1870, large numbers of the European holders of the five-twenty bonds of the act of March 3, 1865, called for redemption, from want of facility for sending their bonds to the United States, or to avoid the risk and expense of transmission, or various other reasons, were obliged to and did sell and dispose of their bonds, in the market, in London, to money-changers, bankers, and merchants, as the only means of obtaining the money for them. Many millions of the said called bonds were thus sold and disposed of in the London market, and dealt in by money dealers during that period, long after the maturity of the various calls;" and also that, "according to the custom and practice in London, the said called bonds of the United States were commonly dealt in by buying and selling after the time fixed for their redemption, in the same way and just as freely as the bonds not called for redemption."

*Mr. Assistant Attorney-General Maury,* on behalf of . the United States, stated that they had no interest in the result of the suit; that their attitude was like that of the complainant in a bill of interpleader.

*Mr. J. Hubley Ashton* for Morgan and another, and Von Hoffman and another.

*Mr. Howard C. Cady (Mr. Waldo Hutchins* was with him) for Manhattan Savings Institution.—These bonds are a contract, and are to be taken with reference to the intent of the

parties, under the law. The government wanted to borrow a large sum, and they devised these bonds as the basis of the required loans. There could be no misunderstanding on the part of any holder that each of the bonds would become payable when the government, in the mode and at the time to be indicated, as prescribed by law, should express its will. It was not necessary to specify more on the face of the instrument than just what is there, to the end purposed. An instrument is to be taken with reference to the law governing it. This was the understanding of the public at large, for in those days bonds of this character were presented almost universally, and of this the court will take judicial notice. Again, this was the understanding of the parties, else why invariably make no claim for interest after those days? And look at the expressions of J. S. Morgan & Co. in the letter dated September 1, 1879: "Much to our surprise, payment has been withheld by the Treasury Department" of these bonds. Again, these bonds became due on the days fixed in the call, or these claimants would not all have been at the doors of the Treasury asking for principal and interest on or about the respective days when they presented these bonds. Still, again, why the notice in the call and in the law that on those days the interest on those bonds so selected and advertised for payment should cease? But we are not left to reasoning alone. Upon the cases decided heretofore by this court the questions presented in these cases are settled. *Texas* v. *White,* 7 Wall. 700, was a case where United States coupon bonds issued to Texas in 1851 were transferred to White while the government of that State was in rebellion, after the 31st of December, 1864. The bonds were dated January 1, 1851, payable by their terms to bearer, and redeemable after the 31st day of December, 1864; and each of them stated that it was "*transferable on delivery.*" The court held: "Purchasers of notes or bonds past due take nothing but the actual right and title of the vendors. The bonds in question were dated January 1, 1851, and were redeemable after the 31st of December, 1864. In strictness, they were not payable on the day when they became redeemable; but the known usage of the United States to pay all

bonds as soon as the right of payment accrues, except where a distinction between redeemability and payability is made by law, and shown on the face of the bonds, requires the application of the rule respecting overdue obligations to bonds of the United States which have become redeemable and in respect to which no such distinction has now been made. Now, all the bonds in controversy had become redeemable before the date of the contract with White." An attempt has been made to ward off the decisive effect of this authority by reason of what was said in connection with the phrase, "except where a distinction between redeemability and payability is made by law and shown on the face of the bonds." By analyzing this we shall see what it does not mean. Certainly it does not mean that in the absence of a distinction made by law and shown, the rule laid down does not apply. What led to the phraseology will better appear, perhaps, by referring to a paragraph on page 703 of the reports, where it is stated: " In pursuance of an act of the legislature of Texas, the comptroller of public accounts of the State was authorized to go to Washington and to receive there the bonds; the statute making it his duty to deposit them, when received, in the Treasury of the State of Texas, to be disposed of '*as may be provided by law ,* ' and enacting further, that no bond issued as aforesaid, and payable to bearer, should be 'available in the hands of *any* holder until the same shall have been indorsed, *in the city of Austin, by the Governor of the State of Texas.*' " The italics are in the original. Applying this to the phrase in question, if such parts of this act as were intended to control the payment of these Texas bonds had been inserted on their face, it would have made such a distinction as to control the terms "redeemable after the 31st of December, 1864 ; " and the rule referred to in connection with the known usage of the United States to pay, &c., would not, by consequence, apply.

But look at this phrase, " distinction between redeemability and payability made by law," and see if by possibility it can apply to the bonds stolen from the Manhattan Savings Institution. Those bonds are, in terms, as will be recollected, redeemable at the pleasure of the United States after July 1, 1870,

and payable on the 1st day of July, 1885. Now, is there any law making a distinction between redeemable and payable, as used in these bonds? None. The act of '65 and the provision of section 3697 of the Revised Statutes as to the mode of working out the pleasure of the United States by calls, numbers, &c., and fixing the day and place of presentation for payment, voice the instrument; but the use of the word "redeemable" invariably contemplates payment in connection therewith. So that in the case of the bonds in these suits, there being no such distinction as that referred to, the Supreme Court of the United States says: "the known usage of the United States to pay all bonds as soon as the right of payment accrues requires the application of the rule that purchasers of bonds past due take nothing but the actual right and title of the vendors to bonds of the United States which have become redeemable." And this point was affirmed in *Texas* v. *Hardenberg*, 10 Wall. 91, where it is said: "We have reconsidered the grounds of that decision [*Texas* v. *White*], and are *still* satisfied with it." And reaffirmed in *Vermilye* v. *Adams Express*, 21 Wall. 138, 145, where it is said : " This point being, as the court considered, settled." Mr. Justice Miller, in delivering the opinion in the Vermilye case, says : " We have not quoted the *language* from the opinion in that case [*Texas* v. *White*] with any view of affirming it. It may admit of grave doubt whether such bonds [the Texas bonds], redeemable but not payable at a certain day, except at the option of the government, do become overdue, in the sense of being dishonored, if not paid or redeemed on that day." But, so far from repudiating the rule itself, as laid down in *Texas* v. *White*, the court unanimously held it applicable to redeemable United States bonds . . .

In proceeding with the consideration of the second proposition of our adversaries, the cases cited seem to be sufficient. They have dwelt much on the *lex mercatoria ;* but these instruments are themselves only of recent introduction, and there can be no custom in regard to them which is a part of the law merchant. That is a graft upon the common law, which by its age and universality has become such a branch of the unwritten law that courts have knowledge

thereof. In the present cases, assuming any practice of trade in these bonds (truly or not), it is claimed to be only of recent growth; and if the wording of an instrument is such as to exclude any such practice, no such usage can affect the established rules settled by adjudication. *Crouch* v. *Credit Foncier*, 8 L. R. Q. B. 374, 386. In *Barnard* v. *Kellogg*, 10 Wall. 383, 391, Mr. Justice Davis says: "It is well settled that usage cannot be allowed to subvert settled rules of law." In *Goodman* v. *Roberts*, 10 L. R. Ex. 357, the Chief Justice of England says: "We must by no means be understood as saying that mercantile usage, however extensive, should be allowed to prevail, if contrary to positive law. . . . To give effect to a usage which involves a defiance or disregard of the law would be obviously contrary to a fundamental principle." In the case of *Vermilye* v. *Adams Express Co.*, above cited, Mr. Justice Miller said: "We cannot agree with counsel for the appellants that the simple fact that they were the obligations of the government takes them out of the rule which subjects the purchaser of over-due paper to an inquiry into the circumstances under which it was made, as regards the rights of antecedent holders." And further on he says: "Bankers, brokers, and others cannot, as was attempted in this case, establish by proof a usage or custom in dealing in such paper which, in their own interest, contravenes the established commercial law. If they have been in the habit of disregarding that law, this does not relieve them from the consequences nor establish a different law." In England, a decade or more ago, a disposition seemingly manifested itself to extend the rule laid down in the leading case of *Miller* v. *Race* by Lord Mansfield, 1 Burr, .452, and as stated in *Swift* v. *Tyson*, 16 Pet. 1, by Mr. Justice Story, in his quaint, incisive way, viz.: "There is no doubt a *bona fide* holder for value, without notice before due, may recover." "This is a doctrine laid up among the fundamentals of the law, and requires no authority," &c. See, also, *Goodman* v. *Simonds*, 20 How. 343. In many of the English cases, both old and modern, certain negotiable instruments are spoken of as passing like money, but in no one of these cases is that phraseology used with reference to the transfer of paper

after due.   It cannot be wise to occupy time in reciting this
class of cases in detail ; many of them specifically maintain the
doctrine that negotiable instruments past due are transferable,
subject to equities.   Notably, in *Miller* v. *Race*, above cited;
*Gorgier* v. *Mieville*, 3 B. & C. 45 ; *Crouch* v. *Credit Foncier of
England*, L. R. 8 Q. B. 374.   Finally, these different claim-
ants adverse to the Savings Institution, are standing in the
shoes of the robbers, so far as title goes.   They derived under
them matured obligations which the Supreme Court of the United
States has repeatedly held to be governed by the laws of nego-
tiable paper.   And in *Commissioners* v. *Clark*, 94 U. S. 278, the
rule is clearly recognized that where there is illegality shown
in a previous holder the presumptions are against the title of
his transferee ; and in all the cases, if the obligation is past due
when taken, it is subject to the right of former rightful owner.

MR. JUSTICE MATTHEWS delivered the opinion of the court.
He recited the facts, as above stated, and continued :

The conclusions of law reached by the Court of Claims, on
which its judgments are founded, and which are stated and
supported in its opinion by the late learned Chief Justice of
that court, are comprised in these propositions: that if the
claimants, J. S. Morgan & Co., and L. Von Hoffman & Co., or
any other party from whom they are shown to have bought,
had purchased the bonds in good faith for value before matu-
rity, their title would prevail against that of the Manhattan
Savings Institution, from whom they had been stolen ; that, on
the face of these bonds, the United States, while fixing a day
of ultimate payment, after which they would certainly be
overdue, had also reserved the right of redemption at an earlier
time, at its pleasure after five years from date ; that, as this
option could be exercised only by the United States, and not by
any officer or department of the government of its mere mo-
tion, it could be declared only by law, as was done in the act
of Congress of July 14, 1870 ; that this right of redemption,
being expressly reserved on the face of the bonds, was part of
the contract, of which every holder had notice by its terms, and,
as it could be exercised only by a public law, every holder sub-

sequent to the passage of such law must be held to know that it might be, and when it had been, exercised; that, consequently, the contract is to be read, after the passage of the act of July 14, 1870, as though the time of redemption fixed and declared in pursuance of it by the call of the Secretary of the Treasury had been originally written in it as the final day of payment; and that, by way of conclusion, it must therefore be adjudged that the claimants, against whom the judgment was passed, were purchasers of overdue paper, and not entitled to the protection of the rule which otherwise would shield their title against impeachment.

And it is insisted in argument that this conclusion is anticipated and required by the decisions of this court in the cases of *Texas* v. *White*, 7 Wall. 700, and *Vermilye* v. *Adams Express Co.*, 21 Wall. 138, 142. It becomes necessary, therefore, at the outset, to examine those cases with particularity.

The bonds in controversy in the first of them were United States coupon bonds, dated January 1, 1851, payable, by their terms, to the State of Texas or bearer, with interest at five per cent., payable semi-annually, and "redeemable after the 31st day of December, 1864." Each bond contained a statement on its face that the debt was authorized by act of Congress, and was "transferable on delivery," and to each were attached six-month coupons, extending to December 31, 1864. White and Chiles acquired their title on March 15, 1865.

The rules established in *Murray* v. *Lardner*, 2 Wall. 110, 118—"that the purchaser of coupon bonds, before due, without notice and in good faith, is unaffected by want of title in the seller, and that the burden of proof in respect to notice and want of good faith is on the claimant of the bonds as against the purchaser"—were repeated and reaffirmed, but it was added: "These rules have never been applied to matured obligations. Purchasers of notes or bonds past due take nothing but the actual right and title of the vendors. The bonds in question were dated January 1, 1851, and were redeemable after the 31st of December, 1864. In strictness, it is true they were not payable on the day when they became redeemable, but the known usage of the United States to pay all bonds as soon as

the right of payment accrues, except when a distinction between redeemability and payability is made by law and shown on the face of the bonds, requires the application of the rule respecting overdue obligations to bonds of the United States which have become redeemable, and in respect to which no such distinction has been made."

It appeared in the case that the bonds were the property of the State of Texas on January 11, 1862, having come into her possession and ownership—so the court declares—"through public acts of the general government and of the State, which gave notice to all the world of the transaction consummated by them;" and the State, while thus their owner, in 1851, passed a legislative act declaring that the bonds should be disposed of "as may be provided by law," but that no bond should be "available in the hands of any holder until the same shall have been indorsed, in the city of Austin, by the governor of the State of Texas." It was in reference to this legislation that the court said: "And we think it clear that if a State, by a public act of her legislature, imposes restrictions upon the alienation of her property, that every person who takes a transfer of such property must be held affected by notice of them. Alienation in disregard of such restrictions can convey no title to the alienee."

In 1862 the legislature of Texas repealed this act of 1851, but the repealing act was held to be void, as an act of a State government established in hostility to the Constitution of the United States, and "intended to aid rebellion by facilitating the transfer of these bonds."

It further appeared that all the bonds which had been put in circulation with the indorsement of the governor had been paid in coin on presentation at the Treasury Department; "while, on the contrary, applications for the payment of bonds without the required indorsement, and of coupons detached from such bonds, made to that department, had been denied. As a necessary consequence, the negotiation of these bonds became difficult. They sold much below the rates they would have commanded had the title to them been unquestioned. They were bought in fact, and, under the circumstances, could only have been bought, upon speculation. The purchasers took the risk

of a bad title, hoping, doubtless, that through the action of the national government, or of the government of Texas, it might be converted into a good one."

" On the whole case," the conclusion was, that the State of Texas was entitled, under the bill, filed for that purpose, to reclaim the bonds from persons who had acquired title under the circumstances stated.

The case came before the court again in another aspect, and is reported as *Texas* v. *Hardenberg*, 10 Wall. 68, in which the grounds of the former decision were reconsidered and declared to be satisfactory.

The same questions, as to part of the same issue of bonds, came again before the court in *Huntington* v. *Texas*, 16 Wall. 402, in which the two prior decisions were relied on, on behalf of the State of Texas, as conclusive. The court rehearsed the propositions decided in those cases, and referring to the question, in regard to the invalidity of the act of 1862, repealing the act of 1851, restricting the negotiability of the bonds, said : " But it must be observed that we have not held that such a repealing act was absolutely void, and that the title of the State could in no case be divested. On the contrary, it may be fairly inferred from what was said in *Texas* v. *White*, that if the bonds were issued and used for a lawful purpose, the title passed to the holder unaffected by any claim of the State. Title to the bonds issued to White and Chiles was held not to be divested out of the State, because of the unlawful purpose with which they were issued, and because the holders were, in our opinion, chargeable with notice of the invalidity of their issue and of their unlawful use."

Some of the same issue of bonds were in litigation before this court in *National Bank of Washington* v. *Texas*, 20 Wall. 72. In that case the title of the appellant was acquired after the 31st day of December, 1864, when they became redeemable, and they were not indorsed by the governor. It was alleged that they were issued and used in aid of the rebellion, but the fact, and all knowledge of it on the part of the appellant, was denied, and the court found the allegations were not sustained by the proof. The question " whether the bonds were overdue,

in the sense which puts a purchaser of dishonored negotiable paper on the inquiry as to defences which may be set up against it," was expressly waived, in the opinion of the court, because, it being "quite clear that they were transferable by delivery after due, the same as before," it followed that, "to invalidate the title so acquired by a purchaser, it is necessary to make out some defect in that title," which the court decided had not been done. In answer to the point that the title of the appellant failed for want of an indorsement by the governor, in support of which *Texas* v. *White* and *Texas* v. *Hardenberg* were cited, the court said:

"On an examination of the report of that case it will be seen that the court was of opinion that it was established, both in evidence and by the answers of some of the parties, that the bonds then in controversy were all of them issued to White and Chiles, and the illegal contract on which they were issued was in evidence, and the court was further of opinion that the parties had notice of these facts."

As to what was said in *Texas* v. *White*, that the indorsement of the governor was essential to the title of a purchaser, on the ground that the State could, by statute, while the bonds were in its possession, limit their negotiability by requiring as one of its conditions the indorsement of the governor, and that the repeal of that statute, in view of its supposed treasonable purpose, was void, it is remarked by the court: "All of this, however, was unnecessary to the decision of that case, and the soundness of the proposition may be doubted."

In the case of *Vermilye* v. *Adams Express Co.*, 21 Wall. 138, the controversy involved the title to treasury notes issued under the act of March 3, 1865, 13 Stat. 468, payable to the holder three years after date, and dated July 15, 1865, bearing interest payable semi-annually, for which coupons were attached, except for the interest of the last six months; that was to be paid with the principal when the notes were presented. On the back of each note was this statement:

"At maturity, convertible at the option of the holder into bonds, redeemable at the pleasure of the government at any time after five years, and payable twenty years from June 15th,

1868, with interest at six per cent. per annum payable semi-annually in coin."

The notes in question were stolen from the Express Company and subsequently bought by Vermilye & Co., bankers in New York; but, at the time of the purchase, more than three years had elapsed from the date of their issue, and the Secretary of the Treasury had given notice that they would be paid or converted into bonds at the option of the holder on presentation to the department, and that they had ceased to bear interest.

The judgment of the court sustaining the title of the Express Company was founded on the fact, that the purchase was made after the maturity of the obligations. Mr. Justice Miller, delivering the opinion of the court, said:

"They had the ordinary form of negotiable instruments, payable at a definite time, and that time had passed and they were unpaid. This was obvious on the face of the paper."

It was further shown that the fact that the holder had an option to convert them into other bonds did not change their character in this respect; and "that the simple fact that they were the obligations of the government" did not take them "out of the rule which subjects the purchaser of overdue paper to an inquiry into the circumstances under which it was made, as regards the rights of antecedent holders." And referring to the case of *Texas* v. *White*, 7 Wall. 700, where the bonds were redeemable after the 31st day of December, 1864, it was stated that the court had there held "that after that date they were to be considered as overdue paper, in regard to their negotiability, observing that in strictness it is true they were not payable on the day when they became redeemable, but the known usage of the United States to pay all bonds as soon as the right of payment accrues, except when a distinction between redeemability and payability is made by law and shown on the face of the bonds, requires the application of the rule respecting overdue obligations to bonds of the United States which have become redeemable and in respect to which no such distinction is made." Mr. Justice Miller then added: "We have not quoted the language from the opinion in that case with any view of affirming it. It may admit of grave

doubt whether such bonds, redeemable but not payable at a certain day, except at the option of the government, do become overdue in the sense of being dishonored if not paid or redeemed on that day.  But the notes in the case before us have no such feature.  They are absolutely payable at a certain time, and we think the case is authority for holding that such an obligation, overdue, ceases to be negotiable in the sense which frees the transaction from all inquiry into the rights of antecedent holders.  This ground is sufficient of itself to justify the decree in favor of the Express Company."

It is apparent that the original decision of the court in reference to the Texas indemnity bonds in *Texas* v. *White*, 7 Wall. 700, has been questioned and limited in important particulars in the subsequent cases involving the same questions.  The position there taken that the legislature of Texas, while the State was owner of the bonds, could limit their negotiability by an act of legislation, of which all subsequent purchasers were charged with notice, although the bonds on their face were payable to bearer, must be regarded as overruled.  And the further position that negotiable government securities, redeemable at the pleasure of the government after a specified day, but in which no date is fixed for final payment, cease to be negotiable as overdue after the day named when they first become redeemable, must be regarded as limited to cases where the title of the purchaser is acquired with notice of the defect of title, or under circumstances which discredit the instrument, such as would affect the title to negotiable paper payable on demand, when purchased after an unreasonable length of time from the date of issue.

In addition to this, the opinion of Chief Justice Chase in the first case expressly excepts from the rule of the decision, out of the class of overdue obligations to which it is applied, those in which " a distinction between redeemability and payability is made by law and shown on the face of the bonds ; " an exception which embraces and defines the very bonds now in question ; for, by law, as well as by the terms of the obligation, they were redeemable at the pleasure of the government after the first day of July, 1870, but were payable, finally and un-

conditionally, on the first day of July, 1885; and the interest coupons attached covered the whole period until the date of ultimate payment. So that, in no aspect, can the cases cited be considered as governing the present, unless, indeed, the implications from them may be treated as furnishing the rule which determines that, at the time when the title of the claimants, in these cases adjudged invalid, accrued, these bonds were not overdue.

The single question in the present cases is whether the bonds in controversy were overdue at the time of the purchase by those who claim title against the Manhattan Savings Institution? That question must be resolved by a proper construction of the contract, contained in the bonds themselves, assuming it to be still open, so far as affected by previous judicial decisions; and, in construing the contract, it must be conceded that the obligations of the government in this form are governed by the rules of the law merchant regulating negotiable securities, modified only, if at all, by the laws of the United States, under the authority of which they were created and put in circulation; and of those laws, and of whatever was lawfully done or declared by the government or its officers in pursuance of them, it is also to be admitted, every holder must be conclusively presumed to have had knowledge.

On their face, these bonds are payable on the first day of July, 1885, and are redeemable at the pleasure of the United States after the first day of July, 1870. This was in conformity to the act of March 3, 1865, 13 Stat. 468, under which they were issued, which expressly authorized that they might be made payable at any period not more than forty years from date of issue, or that they might be made redeemable a' the pleasure of the government at or after any period, not less than five nor more than forty years from date, or might be made both redeemable and payable, as aforesaid, as should be expressed upon their face. They were accordingly made both redeemable and payable as was expressed upon their face.

The pleasure of the government to redeem them, or any part of them, of course, could only be declared by law. Provision to this effect was made by the act of July 14, 1870, which pro-

vided the means for actual redemption by the sale or exchange of the bonds which it authorized the Secretary of the Treasury to issue, and required him to designate by public notice, from time to time, by class, date and number, in the order of their numbers and issue, the particular bonds to be redeemed by payment and cancellation. And the effect, as to all bonds called for redemption and not sooner presented, was declared to be that, "in three months after the date of such public notice, the interest on the bonds so selected and advertised shall cease."

It may be admitted, for the sake of the argument—although the proposition cannot be considered indisputable—that, after the maturity of a call for the redemption of designated bonds, the obligation of the government to pay them thereby became fixed and irrevocable, so that thereafter, on demand and refusal of payment, an action would accrue to the holder for the recovery of the principal and accrued interest, the Court of Claims having jurisdiction in such cases.

In that view, preserving the distinction expressly made by the law between redeemability and payability, the bond becomes, after the maturity of a call for redemption, payable at the option of the holder on demand, but without future interest, at any time prior to the day fixed for ultimate payment, when it becomes unconditionally due. The construction which, after the maturity of such a call, reads the contract as if the day when interest is to cease had been originally inserted as the day of ultimate payment, confounds and obliterates the express distinction made in the law itself between redeemability and payability, and rewrites the contract upon a different basis. The legal effect of the call undoubtedly is to entitle the holder to demand payment at its maturity, and, even though not demanded, to exonerate the government from liability for interest accruing after that date; but, consistently with the terms of the statutes and the obvious purposes in view in the original creation and issue of the securities in the form adopted, it cannot be, that the legal effect of such a call for the purpose of redemption is the same as if the bond had been originally framed as an obligation to pay absolutely on a day previously fixed.

The acts of Congress, under which these and similar bonds of the United States were authorized and issued, do not in terms attach to them the legal quality of negotiable securities ; but they are such in form and fact, and obviously for the purpose of giving them the highest credit and the widest and most unfettered currency, by passing by delivery with a title unimpeachable in the hands of bona fide purchasers for value. In the form in which those now in question were issued, until a call for their redemption was advertised, they were not due upon their face until the day fixed for final payment ; and the right reserved to the government, at its option, to anticipate the payment cannot be construed as affecting the contract injuriously to the holder, any further than the law declaring it, either expressly or by necessary implication, requires. That law gives to the holder three months after the date of the call for redemption within which to present his bonds for payment or exchange, with interest to the date of redemption ; but the only penalty it prescribes, if the holder chooses to retain his original security, is the loss of future interest. In no other respect does it alter the original contract. It seeks to impose upon it no other disability, nor take from it any other immunity. It stands, therefore, upon its statutory basis, as a bond redeemable at the Treasury on demand without interest after the maturity of the call, payable according to its original terms, and not overdue, in the commercial sense, till after the day of unconditional payment. If the obligation had been originally written in that form—a promise to pay absolutely on the 1st day of July, 1885, with interest according to the coupons attached, but redeemable at the Treasury at and after July 1, 1870, interest to cease three months thereafter if not presented for redemption within that period—it would have expressed in advance the exact contract, as it became by the exercise of the reserved option of redemption ; and in that form, it seems to us quite plain that it could not be considered an overdue obligation, in the sense in which that term is applied to ordinary commercial paper, until after the limit fixed for final payment had been passed.

The title of the purchaser of overdue negotiable paper, such

as a bill of exchange or a promissory note, stands on the same footing as if it had been dishonored by a refusal to accept or pay, and had been put under protest. When transferred after it has become due, although not reduced to the rank of an ordinary chose in action, the legal title to which cannot pass by assignment or delivery, it carries on its face the presumption which discredits it, and deprives it of that immunity which, while the time for payment was still running, was secured to it in favor of a bona fide purchaser for value without actual notice of any defect, either in the obligation or the title. This was put by Mr. Justice Buller, in *Brown* v. *Davies*, 3 T. R. 80, on the ground that to take an overdue note or bill was " out of the common course of dealing." Ordinarily a note or bill when due becomes *functus officio*, because it was made to be paid at maturity, and if it fails of its intended operation and effect, the presumption is that it is owing to some defect, which has furnished a sufficient reason to the party apparently chargeable for not having punctually performed his obligation. In the strong language of Lord Ellenborough in *Tinson* v. *Francis*, 1 Camp. 19, " after a bill or note is due it comes disgraced to the indorsee."

No such presumption, in our opinion, arises to affect the title of a holder of the bonds of the United States, such as those now in question, acquired by a bona fide purchaser for value prior to the date fixed in the bonds themselves for their ultimate payment; for, as we have already shown, the only change in the original effect of the contract by the exercise of the right of earlier redemption is to stop the obligation to pay future interest. And as against one choosing for any purpose of his own to retain his bond as a continuing security for the value it always represents, having impressed upon it by the law of its creation the faculty of passing from hand to hand as money, and therefore just as useful in the pursuits of trade and the exchanges of commerce and banking as so much money in the form of coin or bank notes, and more convenient because more portable, no such presumption can be entertained on the ground that its continued circulation is not in the due course of business, that it has fully performed all its intended functions,

and that it has been in any sense dishonored by a refusal on the part of the obligor to fulfil its obligation. On the contrary, supposing the purchaser bound to know, what in fact does not appear on its face, that the bond has been called for redemption under penalty of a stoppage of interest after three months, the very notice, which, it is said, discredits his title, is in fact an advertisement, not that the maker has any ground to refuse payment, but that the previous holder preferred to hold the security for the money rather than to accept the money which it represents.

As we have seen, the true effect to be given to the exercise of the right of redemption within the period of absolute payment is to make the bonds payable during that interval, on demand, but without interest, after three months from the maturity of the call. But the rule, as to ordinary negotiable paper, payable on demand, is that it is not due, without demand, until after the lapse of a reasonable time within which to make demand; and what the length of that reasonable time is, may vary according to the circumstances of particular cases, and must be governed very largely by the intentions of the parties, as manifested in the character of the paper itself, and the purposes for which it is known to have been created and put in circulation. It is said by Baron Parke, in *Brooks* v. *Mitchell,* 9 M. & W. 15, that "a promissory note, payable on demand, is intended to be a continuing security." And in *Losee* v. *Dunkin,* 7 Johns. 70, it is said: "The demand must be made in reasonable time, and that will depend upon the circumstances of the case and the situation of the parties." In reference to the bonds involved in this litigation, we have no hesitation in saying that, at the time the title of the purchasers was acquired, no unreasonable length of time had elapsed after the maturity of the call. On the contrary, we think any holder had a right, without prejudice, except as to loss of interest, to wait without demand for the whole period, at the expiration of which the bond was unconditionally payable.

The fact that interest was to cease to accrue three months after the date of call, had no tendency to discredit the bonds or affect the title of a bona fide purchaser for value in the due

course of trade. While it has been held that a note, the principal of which is payable by instalments, is overdue when the first instalment is overdue and unpaid, and is thereby subject to all equities between the original parties, *Vinton* v. *King*, 4 Allen, 562, yet, it is said by the Supreme Judicial Court of Massachusetts in *National Bank of North America* v. *Kirby*, 108 Mass. 497, 501, "We are referred to no case in which it has been held that failure to pay interest, standing alone, is to be regarded sufficient in law to throw such discredit upon the principal security upon which it is due, as to subject the holder to the full extent of the security, to antecedent equities." " To hold otherwise," said this court in *Cromwell* v. *County of Sac*, 96 U. S. 51, 58, " would throw discredit upon a large class of securities issued by municipal and private corporations, having years to run, with interest payable annually or semi-annually." And the doctrine was reaffirmed in *Railway Co.* v. *Sprague*, 103 U. S. 756. These were cases where non-payment of interest was in breach of the contract and constituted a default. It is much stronger, in its application here, where the obligation to pay interest ceases because that is the contract, to which the holder of the bond has consented and to which he submits, because he prefers to hold a security, although not bearing interest, rather than to surrender it at once.

But an adequate and complete view of the nature and function of the right of redemption reserved in these bonds, and of its intended effect upon the rights of the parties under the contract, cannot be had without considering it in its actual operation and execution. The clause which makes the bonds redeemable was not a casual provision occurring in a single obligation, but was an effective and significant instrument in a series of great financial transactions. The five-twenty bonds issued under the acts of March 3, 1865, 13 Stat. 668, and April 12, 1866, 14 Stat. 31, as we are informed by public official documents, amounted to $958,483,550, nearly a thousand millions of dollars.

On March 1, 1871, the nearest date prior to the commencement of operations under the refunding act of 1870, the following amounts of six per cent. 5-20 bonds were outstanding:

| | | |
|---|---|---|
| Five-twenties of 1862 | | $493,738,350 |
| Five-twenties of March, 1864 | | 3,102,600 |
| Five-twenties of June, 1864 | | 102,028,900 |
| Act March 3, 1865. | Five-twenties of 1865 | 182,112,450 |
| | Consols of 1865 | 264,619,700 |
| | Consols of 1867 | 338,832,550 |
| | Consols of 1868 | 39,663,750 |

"The National Loans of the United States," by Baily, Washington, 1882, p. 94.

Of these, large amounts were held abroad by investors in foreign countries, and had been dealt in by bankers in the principal money centres of the world. It was expected and desired by Congress that this should be so, as the Secretary of the Treasury had been expressly authorized by law to dispose of any of the bonds of the United States, "either in the United States or elsewhere." Act of March 3, 1865, § 2. And under the refunding act of July 14, 1870, as we have already seen, the Secretary of the Treasury established an agency in London for the purpose of delivering the bonds sold under that act, and receiving in exchange therefor the outstanding securities of the United States agreed to be received in payment therefor. The object of this great exchange was to reduce the annual interest on the public debt of the United States from six to the lower rates of five, four and a half, and four per cent. To have called in the redeemable debt and paid for it in gold coin, and to have obtained the gold coin for that purpose by sales of the new securities, would have been awkward, circuitous, and impracticable, involving the needless export and import of a mass of the gold coin distributed by the necessities of the world's commerce throughout its markets, the attempt to do which would have produced disturbances of market values, certain to have defeated it. Any transfer of specie, in large amounts, to meet balances occasioned by these operations, would have been almost as serious in its effects, and was, therefore, by every consideration of public and private interests, to be avoided. The difficult practical question was how to avoid it, how to substitute in the markets of the world one

loan for the other, by an exchange of securities, without any serious and disturbing movement of coin. Congress had placed it within the power of the Secretary of the Treasury to accomplish this by authorizing him to receive the five-twenty bonds, to be redeemed in exchange at par for the bonds to be issued at a lower rate of interest. This he was enabled to do by calling in the five-twenty bonds for redemption, by which they were made equal in value as money to par and interest then due, and by agreeing to treat and receive them as money in the exchange. This created a demand for the "called bonds" to be used for that purpose, and they were bought from the holders by bankers and agents of the syndicates who had contracted to place the new loans under the act of 1870. This transaction could only have been successfully effected upon the assumption that the call for redemption did not affect the negotiable quality of the bonds, nor impose upon them any disability, except the cessation of interest after the maturity of the call, nor deprive them of any other immunity which had previously belonged to them. On the contrary, it must have been within the contemplation of the Treasury Department, and of those with whom it was dealing, that the "called bonds," until finally absorbed by payments into the Treasury in exchange for new bonds, which constituted the fact of redemption, were equivalent, in all legal qualities, to money itself, or to those usual equivalents of money which circulate, without question, as such, like treasury notes payable on demand. And this view, we have already seen, the parties were authorized and justified in adopting by the language and purposes of the statutes under which the transactions were accomplished. By this means an enormous public debt was shifted and converted, so as largely to reduce the burden of its interest; the agents of the government were facilitated in the great work they had undertaken; the individual holders of the securities of the United States, scattered throughout the countries of Europe, received the money due them on the bonds for which they subscribed, at their own domicils; and this series of great financial operations was successfully accomplished without interference with the usual course of the business of

the world, without disturbing the fixed distribution of currency which commerce had apportioned to its appropriate markets, and without unsettling the value of property or labor either at home or abroad. These beneficial results were greatly facilitated, if not made feasible, by the unquestioned negotiability of the called bonds, which, when subjected to the right of redemption reserved by their terms, were thereafter considered and treated as the equivalent of money. This could not have been if the principles which protect *bona fide* purchasers for value, in the due course of trade, without actual notice of a defect in the obligation or title, had not been practically adopted. The practice, as found to have existed, was, in our opinion, well warranted by law.

This confidence was invited by the convenience of the government itself, and certainly promoted its interests and advanced its purposes. The practice it engendered, on the part of the public dealing in its securities, had been expressly sanctioned by formal recognition and approval by the Treasury Department long prior to the negotiation of the war loans, which commenced in 1862. In 1860 Attorney-General Black officially advised the Secretary of the Treasury, 9 Opinions, 413, that treasury notes, redeemable after one year from date, interest thereon to cease at the expiration thereafter of sixty days' notice of readiness to pay and redeem the same, were intended to be a continuing security, and to pass by delivery after the period of redemption equally as before, as money or bank notes not liable to any equities between the original or intermediate parties.

It was, by force of such a custom, declared by Lord Selborne " to be the legitimate, natural and intended consequence (unless there should be any law to prohibit it) of that representation and engagement which appears on the face of the scrip itself, when construed according to the obvious import of its terms," that in the case of *Goodwin* v. *Robarts*, first in the Exchequer Chamber, L. R. 10 Ex. 337, and afterwards in the House of Lords, 1 App. Cas. 476, an instrument, payable to bearer in the bonds of a foreign government, was held to be negotiable by delivery, on the ground that, "after those payments had been made and receipts for them signed, the scrip was s much a

symbol of money due and as capable of passing current upon the principle explained in the authorities, with respect to bank notes and exchequer bills, as the bonds themselves would have been if they had been actually delivered in exchange for it." 1 App. Cas. 497.

We are, therefore, of opinion that the title of J. S. Morgan & Co., and of L. Von Hoffman & Co., respectively, to the bonds claimed by them, ought to have prevailed against that set up by the Manhattan Savings Institution ; and for error in not so holding,

*The several judgments of the Court of Claims in these cases are reversed, and the causes are remanded to that court, with directions to render judgments in accordance with this opinion.*