MUNDY v. PRITCHARD et al.

(Supreme Court, Trial Term, Kings County.    December 8, 1897.)

NOTES—PURCHASE AFTER MATURITY.

Where a note was delivered by its maker to a certain person, who failed to comply with the conditions of its issuance that the proceeds thereof should be applied in payment of another note of the maker, a holder thereof is not entitled to recover thereon where he acquired title thereto after maturity, from a bona fide purchaser, where such holder does not show that he was a purchaser for value.

Action by James G. Mundy against Mary Moore Pritchard and another.    Complaint dismissed.

J. Wolsey Shepard, for plaintiff.

Alexander Campbell, for defendants.

WOODWARD, J.    The plaintiff in this action, James G. Mundy, brings suit in this court to recover $2,000, protest fees, and interest upon a certain promissory note made and indorsed by these defendants.    Payment is resisted upon the grounds that the note was without consideration, and that the plaintiff, coming into possession of the same after it had been dishonored, received it subject to all the equities of the antecedent holders.    The facts, in so far as they are necessary in the decision of this case, are either admitted or established by the evidence produced upon the trial, and they show that on the 1st day of September, 1892, Harry G. Barber, who had been carrying on the business of a dealer in coal in the city of Brooklyn under the name of Alfred Barber's Son, entered into a co-partnership with Pansy B. Pritchard, wife of the defendant Robert K. Pritchard, for the purpose of dealing in coal, such firm being known as Barber & Pritchard.    In the articles of agreement between them it was stipulated that Pansy B. Pritchard was to procure and pay for the services of Robert K. Pritchard "out of her proportions of the profits of said business," and he was to be known as the manager of the business.    Barber contributed to the capital of the firm the horses, carts, etc., at a valuation of $4,000, and Mrs. Pritchard paid in $3,000 in cash and a note for $1,000.    It was agreed between the parties that, in the event of any disagreement as to the affairs of the company, Barber was to have "full power and authority to settle the same," and each party was entitled to draw from the assets the sum of $200 per month, and no more, from the 1st of September, 1892.    The $3,000 invested by Mrs. Pritchard was furnished by Mrs. Mary Moore Pritchard, one of the defendants in this action, and the mother of Robert K. Pritchard, the co-defendant.    Barber was an old and trusted friend of the family, and, soon after the firm of Barber & Pritchard entered into business, Mrs. Pritchard, the defendant, had a conversation with Barber, in which she questioned the propriety of putting so much money into the business, as Robert K. Pritchard was not a bookkeeper or business man, and he was, therefore, at a disadvantage.    Barber assured her that he would look after the money which she invested, and that, as his bookkeeper was an

honest man, who was under obligations to him, everything would be all right. In December, 1893, Mrs. M. M. Pritchard was informed by Barber that her son had withdrawn all of his wife's capital in the business, and on the 29th day of December, 1893, as the attorney in fact of her husband, Stephen Pritchard, she loaned the firm $4,-845.83, the proceeds of a $5,000 note she had discounted to raise the money, and which she afterwards paid. An account was opened with the firm in the name of S. Pritchard, and he was given credit for this amount, the sum being afterwards reduced to $4,678.30 by reason of coal which was delivered and charged to his account. During the month of September, 1895, Mrs. M. M. Pritchard made her accommodation note for $5,000, for the benefit of the firm, and had it discounted at the Bedford Bank. She turned over the proceeds, as she supposed, to the firm, by check dated 18th September, 1895, drawn to the order of Alfred Barber's Son for $4,889.17. The firm was to take care of this note. This note was renewed from time to time, until in July, 1896, it was divided into two notes of $2,500 each, still in the Bedford Bank, one due in two and the other in three months. About the time of the maturity of the two-months note Robert K. Pritchard told his mother of a conversation with Barber, in which it was proposed that Barber should get a note for $2,500 discounted somewhere in New York City, and with the proceeds take up the $2,500 note maturing on the 14th in the Bedford Bank, with a view of improving her credit in that institution by the retirement of one of the notes which they were carrying in that bank. Mrs. Pritchard consented to this proposition, made her note for $2,500, and delivered the same to her son, who gave it to Barber, who indorsed it, and pretended to try and have it discounted in New York City. He reported to Pritchard, and at another time to Mrs. Pritchard, that he could not get the note discounted, and promised to return the same to the maker. Accordingly the note in the Bedford Bank was renewed. It appears from the evidence that Barber did, as a matter of fact, discount this note with the Oriental Bank, in the city of New York, the proceeds passing to the credit of Alfred Barber's Son. Some time prior to the 10th of December, 1896, and before the maturity of the note which he had discounted in New York, Barber told Pritchard, who repeated it to his mother, that he was then in a position to get a note of $2,000 discounted in New York, and that, if she would make a note for $2,000, and advance $500 for a few days, he would get the note discounted, and with its proceeds and the $500 in cash take up a note of $2,500 about to mature in the Bedford Bank. Relying upon these representations, Mrs. Pritchard gave her note, payable to the order of Robert K. Pritchard, for $2,000, together with her own check, and a check which she had received from a third person, for enough to make up the $500 demanded by Barber. These notes and checks were delivered to Barber by Pritchard, and were by him used in the Oriental Bank in meeting the then maturing note for $2,500, leaving the two notes still unprovided for in the Bedford Bank, and the $2,000 note thus diverted from the object for which it was specifically given is the note involved in this action. This note became due on the 10th day of

March, 1897.   Mrs. Pritchard was told by her son that Barber could not get it renewed, and had asked if it could not be again put into the Bedford Bank.   Pritchard and his mother, believing that one of the Bedford Bank notes had been taken up with the proceeds of the notes and checks given to Barber, were anxious to protect the $2,000 note in the Oriental Bank, and with this end in view Pritchard went to the Oriental Bank, and endeavored to have the note held, without protest, until Barber, who was out of the city, should return.   Failing in this, Mrs. Pritchard decided to go to the Bedford Bank, and raise the money necessary to take care of the note, and on this occasion for the first time learned that neither of the notes at the Bedford Bank had been taken up.   The cashier called her attention to the fact, and, after she had drawn the money, she returned it to the Bedford Bank, received her note back, and allowed the note in suit to go to protest.   The note was protested on the 10th day of March, 1897.   On the 17th day of March, 1897, the books of the Oriental Bank showed that the account of Alfred Barber's Son was charged with the sum of $2,003.50, which is the exact amount of the note in suit, with protest fees and accrued interest to that time, which is the usual course of business in the city of New York in dealing with dishonored paper indorsed by a person or firm having an account with the bank.   On the same day this charge appears against the account of Alfred Barber's Son, which is the account to which the proceeds of the note were originally credited.   The cashier of the Oriental Bank testifies that "that note [the one in suit] I gave to Mr. Mundy."   He also testifies that Mr. Mundy, who is an uncle of Barber, was introduced to him by Barber, and that he had never seen him to know who he was until he was so introduced by Barber.   There is no evidence that the bank ever transferred this note for a consideration to the plaintiff.   The bank makes no indorsement of the note, as is customary in the sale of commercial paper; nor is there anything to indicate that the bank ever held a title to this note, except in the ordinary course of its business in loaning money, the note being accepted as collateral, or as a guaranty of the repayment of the money loaned, rather than as property.   On the contrary, it is shown that on the very day that Barber brought his uncle to the bank, and the day on which the cashier testifies that he "gave" this note to Mundy, the account of Alfred Barber's Son, which firm or company was known to the officials of the bank to be composed of Harry G. Barber, as testified by the cashier, was charged with the exact amount of this note, with its protest fees and interest to that date; and in view of all the surroundings, taking into consideration the well-known business usages of New York City banks, we are justified in the conclusion that Alfred Barber's Son, who was one with Harry G. Barber, paid this note; and when Nelson G. Ayres, cashier of the Oriental Bank, "gave" this note to the plaintiff, he was acting as the agent of Barber, and could convey no better title to the note than at that time vested in Barber.   It is not necessary, however, for the purpose of deciding this case, to establish this fact.   The plaintiff came into the possession of this note after maturity, at a time when the law

imposes on him the duty of inquiring into its antecedents; and, the defendants having brought into question its validity, showing an adequate defense were the note in the possession of Harry G. Barber, the burden of proof is upon the plaintiff to show that he came into possession of the note for a good and sufficient consideration, from one who had a clear title.

This rule, laid down by the early English cases, and asserted by Mr. Justice Story in his work on Promissory Notes (section 178), has in practice been made to extend even to notes purchased before maturity, where the defendant has interposed a defense. In the case of Bank v. Green, 43 N. Y. 298, Judge Rapallo, delivering the opinion of the court, says:

"If the defendant had been permitted to prove, and had proved, the defense of duress, the burden would have been thereby thrown upon the plaintiff to prove that it gave value for the note, and the circumstances under which it was received. A plaintiff suing upon a negotiable note or bill purchased before maturity is presumed, in the first instance, to be a bona fide holder. But when the maker has shown that the note was obtained from him under duress, or that he was defrauded of it, the plaintiff will then be required to show under what circumstances and for what value he became the holder. The reason for this rule given in the later English cases is that, 'where there is fraud, the presumption is that he who is guilty will part with the note for the purpose of enabling some third party to recover upon it, and such presumption operates against the holder, and it devolves upon him to show that he gave value for it.' "

In the case of Bank v. Noxon, 45 N. Y. 762, Judge Grover, in delivering the opinion of the court, says:

"The defendants proved that the note in suit had been diverted from the purpose for which it had been delivered to Smith by the maker as his agent. This cast upon the plaintiff the onus of showing that it was a bona fide holder, or had succeeded to the rights of such a holder. Wardell v. Howell, 9 Wend. 170."

This rule, which in a measure modifies the rule set forth in the case of Bank v. Green, quoted above, has not been adhered to by the courts in later cases. In the case of Vosburgh v. Diefendorf, 119 N. Y. 365, 23 N. E. 802, Judge O'Brien, delivering the opinion of the court, sets forth the rule as laid down by Judge Rapallo in 43 N. Y., and adds that "the rule established in this case has been adhered to in this court ever since, as will be seen from the cases above cited." In the case of American Exch. Nat. Bank v. New York B. & P. Co., 148 N. Y. 698, 43 N. E. 168, Judge Gray, in delivering the opinion of the court, says that:

"The rule, in cases where the maker of the note shows that it was obtained from him by some fraudulent practice, requires the holder, who sues upon it, to show under what circumstances and for what value he became such,"—citing Bank v. Green, 43 N. Y. 298.

Accepting this rule, it was not necessary for the defendants in this action to establish that the note was transferred to the plaintiff by Barber. If it should be conceded that the bank had a good title to the note, and that it was acting for itself in delivering the same to the plaintiff in this action, it would still be necessary for Mundy, in the presence of the evidence of fraudulent conduct in putting the note into circulation, to establish that he was a bona fide holder for value, and the circumstances under which he purchased the same.

The defendants prove, beyond any reasonable doubt, that the note in question was given for the purpose of taking up a note in the Bedford Bank in Brooklyn without increasing the liabilities of the maker or indorser; that it was delivered to Barber with this express understanding; and that it was discounted, the proceeds going to the account of Alfred Barber's Son, thus increasing the liabilities of the maker and indorser to the amount of $2,000, without their knowledge and consent.    This being true, there can be no doubt that Barber could not recover were he the plaintiff in this action, and, before his uncle can recover, it will be necessary for him to establish that he is, in fact, the bona fide owner of the note in suit, and that he secured his title for value from one who was a bona fide owner of the same.    "But," says Judge Allen, in delivering the opinion of the court in the case of Comstock v. Hier, 73 N. Y. 274, "when a note is made and indorsed to take up another note, to which the indorser is a party, its use is not a matter of indifference to the indorser, and, if diverted, he may defend himself except as against a bona fide holder for value."    "The plaintiff did not satisfy this rule," says Judge O'Brien in the case of Vosburgh v. Diefendorf, 119 N. Y. 365, 23 N. E. 802, "by showing that he paid value for the note. It was necessary, in order to entitle him to recover, to go further, and show that he had no knowledge or notice of the fraud with which the instrument was tainted from the origin.    The large discount at which the plaintiff purchased the note, the circumstances attending the purchase, his knowledge of the original parties to the transaction, and especially of Henderson, one of the actors in the scheme which resulted in putting the note in circulation, were all proper 'subjects for the consideration of the jury, with reference to the plaintiff's innocence and good faith."    This was a case in which the plaintiff had purchased the note before maturity and from a third party.    "But," says the court in the same case, "in this state it must be regarded now as a settled rule that when the maker of negotiable paper shows that it has been obtained from him by fraud or duress, a subsequent transferee must, before entitled to recover on it, show that he is a bona fide purchaser."

Judge Peckham, in delivering the opinion of the court in the case of Bank v. Kidder, 106 N. Y. 225, 12 N. E. 578, says:

"After maturity, a purchaser for value is not a bona fide purchaser to the extent of being protected in his purchase (unless he succeeds to the rights of such a holder who became such before maturity), for the fact of nonpayment discredits the instrument, and deprives it of any immunity which, before maturity, was secured to it in favor of a bona fide purchaser for value, without actual notice of any defect either in the obligation or the title."

In the carefully considered case of Morgan v. U. S., 113 U. S. 499, 5 Sup. Ct. 597, Mr. Justice Matthews, speaking for the court, says:

"The title of the purchaser of overdue negotiable paper, such as a bill of exchange or promissory note, stands on the same footing as if it had been dishonored by a refusal to accept or pay, and had been put under protest.    When transferred after it has become due, although not reduced to the rank of an ordinary chose in action, the legal title to which cannot pass by assignment or delivery, it carries on its face the presumption which discredits it, and deprives it of that immunity which, while the time for payment was still running, was

secured to it in favor of a bona fide purchaser for value, without actual notice of any defect either in the obligation or title."

There is some effort on the part of the plaintiff to establish the theory that Robert K. Pritchard was overdrawn in his account with the firm, and that the note originally discounted at the Oriental Bank, for which the note in suit was given in partial payment by Barber, was given to make good this deficiency. What effect this might have had, in so far as Robert K. Pritchard is concerned, had this fact been established by the books of the company and the testimony of the bookkeeper, who, it appears, is still in the employ of Barber, it is not necessary now to consider. That Mrs. M. M. Pritchard, the maker of the note, and the defendant in this action, had no knowledge of the fact, and that the note was given for the express purpose of taking up a note in the Bedford Bank, and with no intention of increasing her liabilities, is well established. There is no rule of law better sustained than that which protects this defendant. In the case of Wardell v. Howell, 9 Wend. 170, Justice Sutherland, delivering the opinion of the court, at page 172, says:

"This note has not answered the object for which it was indorsed by the defendant. It was not intended for the benefit of the makers generally, but for the special purpose of being substituted for, or enabling the makers to take up, another note which the defendant had indorsed for them, and which was about falling due. The indorsers did not intend to extend their responsibility for the makers, but to substitute the one note for the other. Where a note has effected the substantial purpose for which it was designed by the parties, an accommodation indorser cannot object that it was not effected in the precise manner contemplated at the time of its creation. But where a note has been diverted from its original destination, and fraudulently put in circulation by the maker or his agent, the holder cannot recover upon it against an accommodation indorser, without showing that he received it in good faith, in the ordinary course of trade, and paid for it a valuable consideration. That it was a gross fraud in Hughes to put this note in circulation is not and cannot be denied. The only question is whether the plaintiffs took it in the ordinary course of trade, and paid for it a valuable consideration. The whole weight of authority, and every consideration of justice and equity, are against the plaintiffs upon this point."

Judge Earl, delivering the opinion of the court in the case of Benjamin v. Rogers, 126 N. Y., at page 65, 26 N. E. 970, says:

"But an accommodation maker of a note, or one who becomes surety upon a note, has a right to determine for himself what use shall be made of the note which he signs. He may impose material or immaterial conditions and terms, and no person, as against him, can get title to the note who takes it with full knowledge, in violation of the terms and conditions imposed upon it by him."

The note in suit was made and delivered by the defendants in this action for the specific purpose of taking up and canceling a certain note in the Bedford Bank. This fact was known to Barber, and in negotiating the note, and causing the proceeds to be diverted to his own use, he violated the conditions on which the note was issued. Having paid the bank the amount of this note, he could not, by any mere jugglery, transfer it to his uncle, and give him a better title than he had himself; and, the paper being thus transferred after its maturity and dishonor, the plaintiff, even had he purchased it of the bank, would be subject to all the equities of antecedent parties. In this case, however, the defendants show that the bank received its

full compensation, and that the title of the plaintiff came from Barber, if at all, and it is as clearly shown that he never had a title under which he could recover from these defendants. In the case of Bank v. Carll, 55 N. Y. 440, Chief Judge Church, delivering the opinion of the court, says:

"The only point presented for the consideration of this court is that the plaintiff failed to prove that it was a bona fide holder for value of the note on which the action was brought. The possession of the note was sufficient, prima facie, to establish this; but when it was proved that the note was given without consideration, and fraudulently put in circulation, it was incumbent upon the plaintiff to prove the fact. It was sought to prove the fact by the president and discount clerk, but these officials did not occupy their respective positions at the time the notes were discounted, and could not, therefore, speak from personal knowledge as to some of the facts. Their evidence proved that the note was in the possession of the bank before maturity, that the usual course of business on discounting a note was for the discount clerk to draw a check upon the president for the amount of the note, less the discount, and for the president and person procuring the discount to indorse it. Such a check was produced, bearing even date with the note for $792. If this check had corresponded with the amount of the note ($500), less the discount, the evidence might have been sufficient to prove the discount, but, being for a larger amount, it required further proof to show that the avails of the note were included in it."

If the same character of evidence which "might have been sufficient to prove the discount" is admissible to prove the payment of this note by Barber, then there can be no question that the bank was fully compensated, and that the plaintiff in this action came into possession of the note in suit after it had been dishonored, and when it was subject to all the defenses to which it would be subject in the hands of Barber, from whom he receives all the title that he has. In any event, the character of the note having been brought in question, the plaintiff was bound to show that it came to him in the usual course of business, that he paid for it a valuable consideration, and that his title was derived from one who had a clear right to the note, free from all defenses. In this the plaintiff has wholly failed, and the complaint is therefore dismissed, with costs.