NEW PADDOCK–HAWLEY CO. v. FAYETTEVILLE WAGON WOOD & LUMBER CO. et al.

(District Court, W. D. Arkansas, Ft. Smith Division. September 6, 1913.)

1. CORPORATIONS (§ 474*)—SUBROGATION (§ 26*)—BONDS—TRANSFER—OWNERSHIP.

Bonds having been issued by a bankrupt corporation, certain of them were pledged to a trust company as collateral to a note for money borrowed from the trust company through the bankrupt's financial agent, the P. H. Co. The proceeds of the note were delivered to the P. H. Co., and credited to the bankrupt. Extension or renewal notes were made which were paid by the P. H. Co. and charged in the same way, and the unsold bonds were delivered to the P. H. Co. by the trust company. *Held* that, the P. H. Co. not being liable on the note, to secure which the bonds were pledged, its claim against the bankrupt being on an open account only, it was not the owner of the bonds so surrendered by the trust company, nor was it subrogated to the trust company's lien.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1854; Dec. Dig. § 474;* Subrogation, Cent. Dig. § 67; Dec. Dig. § 26.*]

2. CORPORATIONS (§ 543*)—INSOLVENCY—SALE OF ASSETS BY COMMITTEE.

A sale of the assets of an insolvent corporation by a committee of its creditors does not differ in any respect from a sale made by an assignee, receiver, or trustee in bankruptcy, and is not a sale in the usual course of business which will confer on the purchaser the rights of a bona fide purchaser for value, without notice.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2161; Dec. Dig. § 543.*]

3. CORPORATIONS (§ 472*)—INSOLVENCY—SALE OF ASSETS BY COMMITTEE—BONA FIDE PURCHASER.

An insolvent corporation in the hands of a committee of creditors had in its possession certain bonds issued by the bankrupt, for which the corporation had acted as fiscal agent, but which it did not own, having received the same from a pledgee to hold and deliver to the bankrupt. The creditors' committee, in order to liquidate the corporation's assets, sold all of the bonds to two persons who organized complainant company to take over and operate the same, and in this way acquired possession of the bonds, which, in addition to having overdue unpaid coupons attached, were, as to some of them, past due as to the principal. *Held,* that complainant acquired no title to the bonds; it being bound by the knowledge of its organizers as to the facts with reference thereto.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1837, 1839, 1841; Dec. Dig. § 472.*]

4. CORPORATIONS (§ 472*)—BONDS—BONA FIDE PURCHASER—SALE TO PLAINTIFF.

Where plaintiff purchased certain corporate bonds after maturity from a bona fide purchaser before maturity, plaintiff, though purchasing with notice of an intervening equity, acquired a title freed from such equity, and subject only to the defenses of limitations, laches, and estoppel.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1837, 1839, 1841; Dec. Dig. § 472.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. LIMITATION OF ACTIONS (§ 25*)—BONDS—LIMITATIONS.

The five-year statute of limitations applies to an action on corporate bonds, and runs against interest coupons as well as the bonds to which they are attached.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 113, 118–131; Dec. Dig. § 25.*]

6. LIMITATION OF ACTIONS (§ 157*)—BONDS—LIMITATIONS—OVERDUE INTEREST COUPON—PAYMENT.

Payment of an overdue interest coupon attached to a corporate bond, against which the statute of limitations has begun to run, does not interrupt the statute as against the bond, nor as against any other overdue coupon attached thereto.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 631–634, 636; Dec. Dig. § 157.*]

7. LIMITATION OF ACTIONS (§ 157*)—CORPORATE BONDS—PAYMENTS.

A suit was brought on certain corporate bonds March 16, 1912. Eight of the bonds fell due March 18, 1906, and on December 20, 1911, there was paid on each of them $15 as interest "from March 18th to September 18, 1906." There was no unpaid coupon covering this period of time. *Held*, that the payment should be considered as having been made on the bonds, and hence relieved it from the bar of limitations; the date of the payment constituting a new point from which the statute would begin to run.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 631–634, 636; Dec. Dig. § 157.*]

8. CORPORATIONS (§ 473*) — ACTS OF OFFCERS — CORPORATE BONDS — ENFORCEMENT—LACHES.

Where complainant corporation was wholly controlled and directed by two individuals, and its only place of business was their office, and they habitually spoke of the property as their own, complainant having left to them the enforcement of payment of certain bonds of the bankrupt defendant, and having indefinitely postponed their collection, when ample authority and sufficient cause existed for foreclosure proceedings, complainant's right to enforce the bonds was barred by laches.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1842–1853, 1855; Dec. Dig. § 473.*]

9. ESTOPPEL (§ 97*)—EQUITABLE ESTOPPEL—RIGHT TO ENFORCE.

Where complainant corporation owned the controlling stock in a bankrupt company, and complainant's officers put out a statement of the bankrupt's assets to a commercial agency, in which no mention of certain bonds of the bankrupt claimed to be owned by complainant was made as a liability, such statement was sufficient to estop complainant to enforce a claim for the bonds against the bankrupt's estate, even as against creditors of the bankrupt who had not paid for the information.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 289; Dec. Dig. § 97.*]

In Equity. Suit by the New Paddock-Hawley Company against the Fayetteville Wagon Wood & Lumber Company and W. W. Key, its trustee in bankruptcy. Decree dismissing bill.

Read & McDonough, of Ft. Smith, Ark., for plaintiff.

E. B. Wall, B. R. Davidson, and McDonald & Grabiel, all of Fayetteville, Ark., for defendant.

YOUMANS, District Judge. This is a suit in equity by the New Paddock-Hawley Company, a corporation of Nebraska, as the alleged

holder and owner of certain bonds of the Fayetteville Wagon Wood & Lumber Company, a corporation of Arkansas, to foreclose a deed of trust given by the latter to secure those bonds. The deed of trust was given on real estate in Washington county, Ark. By an amendment to the bill it is sought to include land in Carroll county, Ark., purchased since the execution of the deed of trust. The Fayetteville Wagon Wood & Lumber Company was adjudicated a bankrupt on the 28th day of February, 1912. W. W. Key was elected trustee on the 15th of March following. The bonds sued on number 64.

The answer of the trustee sets up the following defenses: (1) That the plaintiff is not the holder and owner of the bonds. (2) That the Fayetteville Wagon Wood & Lumber Company does not owe any of them. (3) That plaintiff did not acquire the bonds in good faith for value before maturity in the usual course of business without notice. (4) That plaintiff has been guilty of laches, and is therefore precluded from asserting its claim. (5) The five-year statute of limitations is pleaded as to principal and interest. (6) By an amendment the trustee sets up as an estoppel certain conduct and representations by J. E. and D. A. Baum, stockholders and officers of plaintiff.

The issuance of the bonds and the execution of the deed of trust were authorized on the 13th of March, 1902, by a resolution of the stockholders, and afterwards on the same day by a resolution of the board of directors of the Fayetteville Wagon Wood & Lumber Company. The resolution authorized the issuance of $40,000 in bonds, in denominations of $500 each, numbered 1 to 80, inclusive, with interest at the rate of 6 per cent. per annum. It was provided that 8 of the bonds should mature each year after the execution, making the last to mature 10 years after execution. At that time the capital stock of the Fayetteville Wagon Wood & Lumber Company was $50,000, divided into 2,000 shares of $25 each. George W. Cleveland held 460 shares; Gaius Paddock, 460 shares; George E. Hawley, 460 shares; Orville Paddock, 459 shares; Leslie H. Weston, 120 shares; Emmet W. Lucas, 40 shares; Wiley T. McNair, 1 share. Gaius Paddock, George E. Hawley, and Orville Paddock held all the stock issued to them as trustees of the Paddock-Hawley Iron Company, a corporation doing business at St. Louis, Mo. George W. Cleveland and Leslie H. Weston were president and secretary, respectively, of the Fayetteville Wagon Wood & Lumber Company. Gaius Paddock and Orville Paddock were directors both of the Fayetteville Wagon Wood & Lumber Company and the Paddock-Hawley Iron Company. George E. Hawley was also a director of the latter company. The Paddock-Hawley Iron Company was the financial agent of the Fayetteville Wagon Wood & Lumber Company, and most of the business of the latter was done through the former.

[1] The deed of trust and bonds were signed in the name of the Fayetteville Wagon Wood & Lumber Company by George W. Cleveland, as president, and Leslie H. Weston, as secretary. The Colonial Trust Company of St. Louis was made trustee in the deed of trust. The bonds and deed of trust were taken to St. Louis; but the bonds

were not sold. The Fayetteville Wagon Wood & Lumber Company borrowed from the Colonial Trust Company the sum of $40,000, and executed its note therefor in the name of the corporation by its president, with George W. Cleveland, L. H. Weston, Gaius Paddock, George E. Hawley, and Orville Paddock as indorsers. The note ran for six months, with the privilege of renewal. The bonds were deposited as collateral to the note, and the Trust Company was authorized to sell any or all of them at not less than 97½ cents on the dollar and accrued interest, and to apply the proceeds to the payment of the note. The bonds bore date March 18, 1902. Interest was payable semiannually, and was evidenced by coupons attached to the bonds. It appears from the testimony that the note bore date March 28, 1902. The proceeds of the note were delivered to the Paddock-Hawley Iron Company, and credited on its ledger on its account with the Fayetteville Wagon Wood & Lumber Company. The expense of preparing the bonds and attorney's fees for examination were paid by the Paddock-Hawley Iron Company, and charged on its account with the Fayetteville Wagon Wood & Lumber Company. As the interest coupons fell due, they were paid by the Paddock-Hawley Iron Company, and charged in like manner. The bonds which matured in 1903 and 1904 were likewise paid by the Paddock-Hawley Iron Company and charged. The extension or renewal note was paid and charged in the same way, and the unsold bonds were delivered to the Paddock-Hawley Iron Company by the Colonial Trust Company. In the meantime 12 of the bonds, representing $6,000 of face value, had been sold by the trustee. They were bonds numbered from 45 to 48, inclusive, which fell due March 18, 1907, and 49 to 56, inclusive, which fell due March 18, 1906. The testimony shows that $26,000 of bonds, 52 in number, were delivered by the Colonial Trust Company to the Paddock-Hawley Iron Company. These, with the 16 that had been retired, and the 12 that had been sold, made the 80, the original issue. The bonds retired were numbered from 65 to 80, inclusive. Those delivered to the Paddock-Hawley Iron Company were numbered from 1 to 45, inclusive, and 57 to 64, inclusive. From these facts it is clear that the Paddock-Hawley Iron Company never became the owner of any of these bonds. The indebtedness to it from the Fayetteville Wagon Wood & Lumber Company was represented by the debit balance on the books of the former, and the credit balance on the books of the latter. There was no sale of the bonds to the Paddock-Hawley Iron Company, nor was there any agreement by which it should hold the bonds as security. It was not subrogated to the lien of the Colonial Trust Company, because it was under no obligation to pay the note as security for which the bonds were pledged. The Paddock-Hawley Iron Company was in no way liable on that note. It was neither a surety nor indorser. Ætna Life Insurance Co. v. Middleport, 124 U. S. 534, 8 Sup. Ct. 625, 31 L. Ed. 537. According to the testimony of its president, Gaius Paddock, it was the custodian of the bonds before they were pledged. It received the proceeds of the note, and gave credit on its account. It charged on that account all amounts which it paid

out. When the bonds were returned, it stood in the same relation to them that it did before they were pledged to the Colonial Trust Company. It afterwards pledged the bonds for its own debts. This was done without authority from the Fayetteville Wagon Wood & Lumber Company. George W. Cleveland sold all his stock in the latter company, and ceased to have any connection with it in December, 1902. L. H. Weston was then elected president. He ceased to be an officer and stockholder of the company in August, 1905. J. H. Berry then became president. He seems never to have understood the situation with reference to the bonds. His testimony indicates that he assumed that the Paddock-Hawley Iron Company was the purchaser and owner of the bonds, and, in addition, that the Fayetteville Wagon Wood & Lumber Company owed the balance shown on its account. The Paddock-Hawley Iron Company managed the affairs of both companies. It is clear that up to this time the Paddock-Hawley Iron Company not only did not own the bonds, but had no interest in them. In September, 1904, the Paddock-Hawley Iron Company became so badly involved that its business and all of its assets were placed in the hands of a committee of its creditors. This expedient was resorted to in order to avoid proceedings in bankruptcy. This committee proceeded to convert these assets into cash, to ascertain who the creditors were, and to apply the amount collected to the payment of their claims pro rata. The committee paid from the assets of the estate 30 per cent. upon each claim allowed. Shortly after the committee took charge, it began negotiations with J. E. and D. A. Baum of Omaha, Neb., looking to a sale to them of all of the assets. These negotiations continued for a period of 22 months, until the 20th of July, 1906, on which date a sale was consummated. In accordance with the agreement between the committee and J. E. and D. A. Baum, they took a bill of sale from the board of directors of the Paddock-Hawley Iron Company of all its assets, without inventory, in consideration of the sum of $240,000. This included all collateral pledged by the Paddock-Hawley Iron Company with its creditors, and balances on book accounts. This was done with the consent and advice of the committee. At that time the 8 bonds which fell due March 18, 1905, and the 8 bonds which fell due March 18, 1906, were unpaid. All of those falling due in 1905, and 4 of those falling due in 1906, 12 in all, were among those claimed to have been included in the purchase. Three overdue interest coupons were attached to each bond, except those which fell due in 1905. Manual delivery was not made of these bonds. J. E. and D. A. Baum did not obtain possession of all of them until August, 1911. The Baums were not bona fide purchasers for value in the usual course of business, without notice.

[2] The sale of the assets of an insolvent corporation by a committee of its creditors does not differ in any respect from a sale made by an assignee, receiver, or trustee in bankruptcy. That character of sale is not a sale in the usual course of business. Kinney v. Paine, 68 Miss. 258, 8 South. 747. This sale made by the creditors' committee in a lump, without inventory, was not a sale in the

usual course of business, and did not constitute the Baums bona fide purchasers of the bonds. The 12 overdue and unpaid bonds were not only notice so far as they were concerned, but were notice as to the remainder of the bonds. The overdue coupons on 56 of the bonds were, under the circumstances, notice of dishonor. It is true that unpaid interest coupons are not alone sufficient to discredit negotiable paper. Cromwell v. County of Sac, 96 U. S. 51, 24 L. Ed. 681; Morgan v. U. S., 113 U. S. 476, 5 Sup. Ct. 588, 28 L. Ed. 1044.

[3] But in this case the unpaid coupons did not stand alone. In connection therewith were the following facts: (1) Liquidation of the ostensible owner on account of insolvency. (2) The possession of the assets of the ostensible owner by a creditors' committee. (3) Sale of bonds in connection with sale of the stock of goods, without inventory. (4) The known desire and effort of the creditors' committee to collect all obligations due the ostensible owner and convert all assets into cash to apply to the payment of the debts of the ostensible owner. (5) Eight of the bonds being 16 months, and 2 of them 4 months, past due.

These added facts were ample to charge J. E. and D. A. Baum with notice, and to let in the equitable defenses of the Fayetteville Wagon Wood & Lumber Company.

The New Paddock-Hawley Company was organized by J. E. and D. A. Baum for the sole purpose of taking over all the assets of the Paddock-Hawley Iron Company. It was organized on the 19th day of July, 1906, by J. E. Baum, and D. A. Baum, and F. C. Hawley. J. E. and D. A. Baum owned every share of the stock. D. A. Baum was president, and J. E. Baum was secretary and treasurer. They constituted a majority of the board of directors; the other director being Daniel Baum, Jr. On the next day immediately after the sale by the committee to J. E. and D. A. Baum they conveyed the same assets to the New Paddock-Hawley Company in consideration for stock in that corporation. To say that under those circumstances the corporation did not have the same notice which its president and secretary and majority of its board of directors had would be ludicrous, not to say farcical.

[4] With regard to the 12 bonds purchased from Mrs. D. Zaner through the Commonwealth Trust Company, the situation is different. The uncontradicted testimony shows facts establishing that Mrs. Zaner was a bona fide purchaser for value of those bonds. It is true that the New Paddock-Hawley Company did not purchase these 12 bonds until after maturity. Ordinarily that is sufficient to charge a purchaser with notice of an intervening equity; but that rule does not apply in the case of a purchaser after maturity from a bona fide purchaser before maturity. Miles v. Dodson, 102 Ark. 422, 144 S. W. 908; Montclair v. Ramsdell, 107 U. S. 147, 2 Sup. Ct. 391, 27 L. Ed. 431; 7 Cyc. 938. As to these 12 bonds, the plaintiff has a good title, subject, however, to the defenses of limitation, laches, and estoppel.

[5] The bill in this case was filed on the 16th of March, 1912. The five-year statute of limitations applies. It runs against interest coupons as well as obligations to which they are attached. Amy v. Dubuque, 98 U. S. 470, 25 L. Ed. 228. Therefore, all coupons which matured more than five years prior to March 16, 1912, are barred by limitations.

[6] The payment of an overdue interest coupon attached to a bond, against which the statute has begun to run, does not interrupt the running of the statute against the bond, nor against any other overdue coupon attached to the same bond. There are, however, no bonds included among the 12 purchased from Mrs. Zaner, against which the five-year statute had run.

[7] As stated, this suit was brought on the 16th day of March, 1912. Eight of these bonds fell due March 18, 1906. On the 20th of December, 1911, there was paid on each one of these eight bonds the sum of $15 as interest "from March 18, 1906, to September 18, 1906." There was no unpaid coupon covering this period of time. Therefore, the payment in each case was on the bond, and relieved it from the bar of the statute of limitations. The date of payment constituted a new point from which the statute would begin to run.

The next question is that of laches and estoppel. Laches may alone be a sufficient defense. Sullivan v. Portland, etc., R. Co., 94 U. S. 806, 24 L. Ed. 324; Richards v. Mackall, 124 U. S. 188, 8 Sup. Ct. 437, 31 L. Ed. 396. In this case acts constituting estoppel are added to laches. The facts relied upon by the trustee relate to the conduct and alleged misrepresentations of J. E. and D. A. Baum. The consideration of those questions involves the consideration of the sufficiency of the facts to constitute estoppel, and whether the New Paddock-Hawley Company can be bound by the conduct and representations of the Baums. These two points will be considered together. As already stated, the New Paddock-Hawley Company was organized on the day before the transfer to J. E. and D. A. Baum of the assets of the Paddock-Hawley Iron Company, for the purpose of taking over those assets, and issuing its stock therefor. The Baums agreed to pay to the creditors' committee for those assets $240,000 in deferred payments, falling due annually during a period of five years. In this purchase the Baums did not assume any of the debts of the Paddock-Hawley Iron Company. The notes given for the purchase price were to be divided in such amounts as the committee might indicate for its "convenience in distribution," the interest rate and date of payment remaining the same. The second and third paragraphs of the proposal of the Baums to the creditors' committee submitted to the creditors of the Paddock-Hawley Iron Company under date of March 2, 1906, were as follows:

"Second: Understanding that there are unsecured Schedule A claims, amounting to $246,000.00, we offer to any such creditor who may, within thirty (30) days so elect, in exchange for his pro rata share in cash and note distribution, the same pro rata share of $70,000.00 in cash and $176,000.00 in the preferred stock of the corporation above referred to.

"Third: We will guarantee four per cent. (4%) annual dividends on the stock issued as above provided for, for the first ten (10) years, and five per

cent. (5%) for the next five (5) years, and we agree to redeem any of such stock at par at the end of fifteen (15) years, the holders of which may so elect upon written notice being given us by the holder thereof, six (6) months before the expiration of fifteen (15) years from this date; and we shall likewise have the option to purchase said stock at par at any time upon six (6) months' written notice to the holder thereof.

"A reference to this proposal shall be made upon the face of such certificates, and a copy of this paragraph shall be embodied therein."

The corporation referred to was the one to be organized.

This proposition was accepted and carried out substantially. The only apparent reason for the organization of the New Paddock-Hawley Company was to obtain additional time for the payment of the purchase price. Preferred stock was given to the unsecured creditors for their pro rata share of cash and notes, with a guaranty of an annual dividend, and an agreement to redeem the stock at par at the expiration of 15 years at the option of the holder and the option on the part of the Baums to purchase any part of the stock at par upon six months' notice. The organization of the corporation was simply a device to secure additional time, if it was desired by the Baums. The obligation of the Baums made it necessary for them to have and maintain control of the corporation. The New Paddock-Hawley Company carried on for a year or more at St. Louis the same character of business that the Paddock-Hawley Iron Company had carried on. It then sold all of its stock of goods, and retained its notes and accounts. It opened an account with the Fayetteville Wagon Wood & Lumber Company. The first item on that account, as shown by a copy filed with the referee in bankruptcy, was entered under date of October 1, 1906. The item is a charge, "To balance $26,314.44." Eighteen other items follow, entered from time to time; the last one being March 6, 1907. Under date of March 15, 1910, this item appeared: "Interest to date at 6%, $10,-417.50." Credits are entered under different dates; the last one being under date of February 18, 1910. The balance due March 15, 1912, is stated to be $35,107.38. So far as the testimony shows, no demand was ever made for the payment of any part of this balance, or for the payment of principal and interest on the bonds, either by the New Paddock-Hawley Company, or by the Baums, until the fall of 1911. From the time of the purchase of the assets of the Paddock-Hawley Iron Company by J. E. and D. A. Baum, daily reports were made to them by J. H. Berry, president of the Fayetteville Wagon Wood & Lumber Company. No stockholders' meeting of the latter corporation was held after September 23, 1905, on which date Berry was elected president, until the 28th day of October, 1911. From July 20, 1906, J. E. and D. A. Baum held about 95 per cent. of the stock. Although they were not officers of the corporation, they were recognized by Berry as owners of practically all of the stock, and they controlled the business. At different times Berry urged upon them the holding of a stockholders' meeting and the necessity of some action with regard to the bonds and account, so that a statement could be made in which they would not appear as liabilities. His attitude is shown by the following letter:

"Sept. 7, 1909.

"Mr. D. A. Baum, 16th and Harney Streets, Omaha, Neb.

"Dear Sir: I have just been advised by H. K. Wade, cashier of the Mc-Ilroy Banking Co., that the bank insists upon a financial statement being made, and am advised by our attorney that it will not be advisable for me to file such a statement under the present conditions. Any statement which I would make would necessarily be made out in accordance with the books, and a statement made from the books would be worse than useless, as they show the bond account to be $31,000.00 and the P. H. I. Co. account to be something like $26,000.00, and we now owe the bank $5,000.00. The result would be the statement would show that the capital stock is impaired almost to the vanishing point. Of course, I understand that you, as owner, have something like 92% of stock, and have taken up the P. H. I. Co. stock as well as to keep the bonded indebtedness out of the way; but these facts are not shown on the books. We would be glad to hear from you in the matter. It seems to me that we ought to have a stockholders' meeting to reorganize in some way, so as to get the affairs of the company straightened out on the books."

The significant part of the letter is the following sentence:

"Of course, I understand that you, as owner, have something like .92% of stock, and have taken up the P. H. I. Co. stock as well as to keep the bonded indebtedness out of the way; but these facts are not shown on the books."

The reference to keeping "the bonded indebtedness out of the way," used in connection with the making of a statement for the purpose of obtaining credit, shows that Berry entertained the idea that the bonds would not be enforced against such persons as could be induced to extend credit to the Fayetteville Wagon Wood & Lumber Company. There is nothing to show that anything was ever said by J. E. or D. A. Baum to disabuse Berry's mind of that idea. On the contrary, there is positive testimony showing that J. E. Baum sought to confirm that impression and extend it generally to all persons contemplating extending credit to the Fayetteville Wagon Wood & Lumber Company.

Under date of June 30, 1910, J. E. Baum made to R. G. Dun & Company for general circulation to its subscribers the following statement of the affairs of the Fayetteville Wagon Wood & Lumber Company:

"Assets.

| | | |
|---|---:|---:|
| Shops & real estate.................................................$ | 30,000 | 00 |
| Alpena sheds, real estate, and timber lands (est)............... | 17,000 | 00 |
| Office furniture and fixtures..................................... | 1,500 | 00 |
| Machinery and appliances........................................ | 31,000 | 00 |
| Stock on hand (estimated)....................................... | 57,093 | 45 |
| Bills receivable..........................................None | | |
| Accounts receivable............................................. | 13,520 | 63 |
| Cash on hand and in bank....................................... | 581 | 99 |
| | **$150,696** | **07** |

"Liabilities.

| | | |
|---|---:|---:|
| Bills payable.................................................... | 15,049 | 94 |
| Accounts payable............................................... | 2,840 | 09 |
| Bonds outstanding.............................................. | 31,000 | 00 |
| Capital stock................................................... | 100,000 | 00 |
| Total ...................................................... | **$148,890** | **03** |

"The capital stock and bonds of this company are all owned by J. E. and D. A. Baum.                                    [Signed] J. E. Baum."

The statement of the ownership of the stock and bonds could have had no other effect than to induce the belief that the bonds would not be enforced against general creditors. In addition to that, the statement was untrue in matters that were bound to be known to J. E. Baum, both as an individual, and as secretary and treasurer of the New Paddock-Hawley Company. The amount of the bonds was stated to be $31,000, when, as claimed in this suit, the amount is $32,000. No statement was made of accrued and unpaid interest, which at that time amounted to at least $10,000. The account of the New Paddock-Hawley Company was likewise not mentioned. It was more than $35,000. Thus he left out of the statement liabilities to the amount of at least $45,000. If that amount had been added to the liabilities set out in that statement, it is perfectly clear that no one would have extended a dollar's credit to the corporation. J. E. Baum could not have been required to make a statement; but, when he voluntarily undertook to do so, it was incumbent upon him, not only to tell the truth, but to tell the whole truth. The testimony shows that the assets of the bankrupt, exclusive of the property described in the deed of trust, are not sufficient to pay the debts now proved against the estate, among which the claims of plaintiff are not included. The conclusion cannot be avoided that J. E. and D. A. Baum, both as individuals, and as officers of the New Paddock-Hawley Company, knew from the time of the purchase of the assets of the Paddock-Hawley Iron Company that the Fayetteville Wagon Wood & Lumber Company was insolvent. Under date of March 29, 1907, D. A. Baum wrote to Berry the following letter:

"Mar. 29, 1907.

"Mr. J. H. Berry, Fayetteville, Kansas.

"Dear Sir: It appears from information which is just coming to me in the way of letters of inquiry from the holders that the bonds of the Fayetteville Company have all matured for retirement or payment on March 18th; this I did not know anything about. As I understand it, the bond issue amounts to $32,000, of which $20,000 have come into our hands through the purchase of the Paddock-Hawley Iron Company's assets; $6,000 more of these bonds are held by the Lafayette Bank in St. Louis as collateral, and they have not yet accepted settlement of their claim against the Paddock-Hawley Iron Company; when they do the bonds will come to us; $6,000 more of these bonds are owned by the Commonwealth Trust Company of St. Louis, who are urging upon me very strongly to buy them. You will perhaps have some letters come to you in regard to these bonds, asking for payment of interest and of principal; I think there is only one answer to make in the matter, and that is that the company is not in a position to do either. There is no danger whatever of foreclosure on the part of anybody; both the Commonwealth Trust Company and the Lafayette Bank have recently learned just what these bonds cover, and I think they both appreciate that to enforce a collection would entail a considerable loss to them. I am trying very hard to get the Lafayette Bank matter closed up, and, as soon as I have done that, I hope to be able to buy the bonds which the Commonwealth Trust Company holds.

"Very truly yours,                     [Signed]   D. A. Baum."

Here is a specific direction not to pay either principal or interest on the bonds and not to fear foreclosure, because the holders of the bonds appreciate "that to enforce collection would entail a considerable loss to them."

Under date of April 10, 1907, D. A. Baum wrote to Berry the following letter:

"Omaha, Neb., Apr. 10th, 1907.

"J. H. Berry, Fayetteville, Ark.

"Dear Sir: Your letter of Apr. 2nd duly received, and all contained therein has been carefully noted. I do not understand the entry of July 1st, 1905, $1,000 charged to the Colonial Trust Co. The situation, as I understand it, being that the total issues of bonds was $32,000—$6,000 of these bonds being owned by the Commonwealth Trust Co. of St. Louis, $6,000 more of them being owned by the Paddock-Hawley Iron Co. The balance of these bonds,. $20,000, were also owned by the Paddock-Hawley Co., and were up for collateral, along with $3,000 of the last-named $6,000 bunch. These bonds were transferred to us, along with the assets of the Paddock-Hawley Iron Company; but in our settlement with the secured creditors, which, as you know, was made by notes, these bonds were left as collateral as follows: With the Edwardville Bank, $11,000. With the Lafayette Bank, $6,000. With the· T. A. Bannister, $6,000. None of these collateral holders have any·call on you for interest or principal. The Lafayette Bank might get to that position by foreclosure and sell all their security, as they have not accepted our settlement for the old transaction, but still hold the Paddock-Hawley Iron Co. note· as originally made, with collateral attached; but before doing anything they would have to sell their collateral out, and foreclosure proceedings would have to be brought by the buyer of these bonds, and I don't know of anybody who would be a likely purchaser, aside from myself. The other people, Commonwealth Trust Co., own the bonds which they have, and can call for their· principal and interests, and under the terms of the mortgage, I understand that after six months' delinquency the foreclosure proceedings may be brought ;. but they understand the situation so well that there is no liability of action in that quarter, in my opinion.

"I am much inclined to think that an advance in prices would be wise at this time. The conditions in the wood stock business were never as they are now. I enclose a letter from J. A. Brown & Co., which adds much to the situation, as these people were perhaps the largest makers of finished stock in the country. You can just as well get 10 or 15 per cent. more for your goods. as what you are now getting, so I believe if I were you I would advance· the prices all along the line.

"Yours truly,    [Signed]  D. A. Baum."

This discloses a knowledge on the writer's part that foreclosure· proceedings could be brought "after six months' delinquency." In fact, the deed of trust provided that the failure to pay any interest coupon or matured bond for 90 days rendered the entire indebted-- ness due and payable at the election of the legal holder or holders· of any one or more of the bonds outstanding. Objection was made by· plaintiff to the introduction of the statement made by J. E. Baum on two grounds: (1) That the plaintiff could not be bound by it in any way. (2) That the creditors who testified that they extended credit on the strength of it were not subscribers to R. G. Dun & Co., and therefore not legally entitled to see it.

[8] With regard to the first objection, the testimony shows conclusively that the affairs of the plaintiff were wholly controlled and' directed by J. E. and D. A. Baum; that the only place of business it had was the office of these men, and they habitually spoke of the· property of the plaintiff as their own. Having confided all of its· business to J. E. and D. A. Baum, and having left to them the mat-- ter of the enforcement of the payment of these bonds, and having· postponed their collection, when ample authority and sufficient cause·

existed to enforce collection, it cannot be heard to disclaim responsibility for their acts in connection with the bonds and the management of the business of the Fayetteville Wagon Wood & Lumber Company.

[9] With regard to the second objection, it is sufficient to say that a man who puts in circulation a written statement intended to deceive cannot escape liability, on the ground that the individual who complains of the deception had not paid for the privilege of reading the statement.

The testimony fully sustains the defenses of laches and estoppel. A decree will be entered dismissing the bill, but saving to the plaintiff the privilege of intervening for any balance that may remain of the proceeds of the sale of the property described in the deed of trust after the payment of all of the creditors and the expenses of the bankruptcy proceedings.