226 F.2d 297
 BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION
v.
Arthur A. ROCCO, Gilbert S. Parnell, First National Bank in
Indiana and Federal Reserve Bank of Cleveland.
Appeal of FIRST NATIONAL BANK IN INDIANA.
Appeal of BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION.
Appeal of Gilbert S. PARNELL.
 Nos. 11526, 11533, 11536.
 United States Court of Appeals Third Circuit.
 Argued April 19, 1955.
Reargued June 6, 1955.
Decided Oct. 12, 1955.
 
 Harvey A. Miller, Jr., Pittsburgh, Pa. (Harvey A. Miller, Miller & Miller, Pittsburgh, Pa., Tomb & Tomb, Indiana, Pa., on the brief), for First National Bank in Indiana.
 John M. Duggan, Jr., Pittsburgh, Pa., for Gilbert S. Parnell.
 Robert L. Kirkpatrick, Pittsburgh, Pa. (T. W. Pomeroy, Jr., Robert L. Becker, Jr., Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., on the brief), for Bank of America Nat. Trust and Savings Ass'n.
 Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY, and HASTIE, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 This was an action brought by the plaintiff against four defendants to recover the value of certain bonds which allegedly were stolen from the bank. These bonds came into the possession of defendant Rocco. They were presented by defendant Parnell, on behalf of Rocco, for collection to the First National Bank in Indiana, Indiana, Pennsylvania, and by it forwarded to the Federal Reserve Bank of Cleveland. This bank cashed the bonds, paid the First National Bank in Indiana and it, in turn, issued a cashier's check to Parnell. The check was cashed, and the money turned over to Rocco.[1] The Federal Reserve Bank of Cleveland was dropped out of the litigation at the end of plaintiff's case, and neither side makes point of this fact on appeal. Therefore, we are not concerned with the correctness or incorrectness of that ruling. Rocco did not appeal.[2] The two appellants, therefore, are the lawyer (Parnell) who presented the bonds to the First National Bank in Indiana and that bank itself.
 
 
 2
 These bonds were bearer bonds issued by the Home Owners' Loan Corporation with both principal and interest guaranteed by the United States. The issue date was May 1, 1934. The maturity date was May 1, 1952. There were interest coupons attached calling for interest payments semi-annually.
 
 
 3
 The trial was conducted on the theory that the rights of the parties and the burden of proof were governed by state rather than federal law since the case was considered an ordinary, garden variety, diversity of citizenship case. The appellants urge that federal law, under which they claim significantly different results would be reached, should have governed the case.
 
 
 4
 We think that the doctrine of Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, affirming this Circuit, 3 Cir., 1942, 130 F.2d 93, is controlling and compels the conclusion that where United States bonds are concerned, we must look to federal law to determine not only the nature of the obligations, rights, and duties of the United States as a party, but also the rights and duties of holders and transferees of such bonds among each other.
 
 
 5
 In the Clearfield case, the Supreme Court said: 'The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law,' and the reason expressed by the court was: 'The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain. And while the federal law merchant, developed for about a century under the regime of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, represented general commercial law rather than a choice of a federal rule designed to protect a federal right, it nevertheless stands as a convenient source of reference for fashioning federal rules applicable to these federal questions.' 318 U.S. at page 367, 63 S.Ct. at page 575.
 
 
 6
 Those reasons are just as cogent for the application of federal law to the determination of the rights of transferees to these government bonds, which rights flow naturally from a determination of the nature and character of the bonds. Whether or not the United States is a party to a dispute concerning transactions in government bonds should not make a difference in the applicable law. The desirability of having uniformity of results in a determination of the rights of transferees of such bonds is just as important as having uniformity in a determination of the rights and liabilities of the United States, a party to the original obligation, so that the vast amounts of government bonds presently in circulation can be free of the myriad of doubts which would arise if the rights of the transferees must be determined by the several and diverse laws of the states, for then a purchaser of such bonds would, of necessity, in each case have to make inquiry as to the prior route taken by the bonds.
 
 
 7
 In National Metropolitan Bank v. United States, 1945, 323 U.S. 454, at page 456, 65 S.Ct. 354, at page 355, 89 L.Ed. 383, the Supreme Court in commenting on the Clearfield case said: 'Our conclusion was that legal questions involved in controversies over such commercial papers are to be resolved by the application of federal rather than local law and that, in the absence of an applicable Act of Congress, federal courts must fashion the governing rules.' See American Houses, Inc., v. Schneider, 3 Cir., 1954, 211 F.2d 881; United States v. Dauphin Deposit Trust Co., D.C.M.D.Pa.1943, 50 F.Supp. 73; Beutel's Brannan, Neg. Ins. Law 108 (7th ed.). We think that federal law should govern in the instant case.
 
 
 8
 The appellants urge that under federal law the purchaser of coupon bonds before due, without notice and in good faith, is unaffected by want of title in the seller, and the burden of proof in regard to notice and good faith is on the claimant of the bonds as against the purchaser. They further urge that the plaintiff in this case did not sustain its burden of proof.
 
 
 9
 Under federal law, we think the established rule is as the appellants say. In Murray v. Lardner, 1864, 2 Wall. 110, 17 L.Ed. 857, the rule was enunciated that the purchaser of coupon bonds before due, without notice and in good faith, is unaffected by want of title in the seller, and the burden of proof in regard to notice and want of good faith is on the claimant of the bonds as against the purchaser. This was repeated and reaffirmed in State of Texas v. White, 1868, 7 Wall. 700, 19 L.Ed. 227, and was apparently reaffirmed in Morgan v. United States, 1885, 113 U.S. 476, 5 S.Ct. 588, 28 L.Ed. 1044. See Swift v. Tyson, 1842, 16 Pet. 1, 15, 10 L.Ed. 865 (subsequently overruled on other grounds); Presidio County v. Noel-Young Bond Co., 1909, 212 U.S. 58, 70, 29 S.Ct. 237, 53 L.Ed. 402. Murray v. Lardner has never been overruled and has been referred to by the Supreme Court as late as 1935. See Graham v. White-Phillips Co., 1935, 296 U.S. 27, 32, 56 S.Ct. 21, 80 L.Ed. 20; Marine National Exchange Bank of Milwaukee, Wis. v. Kalt-Zimmers Co., 1934, 293 U.S. 357, 364, 55 S.Ct. 226, 79 L.Ed. 427. See also 11 C.J.S., Bills and Notes, § 654g, wherein it is pointed out that the federal law (and the common law) and the law under the Negotiable Instruments Act in many states are not in accord. It was incumbent upon the plaintiff to sustain its burden of proving notice and want a good faith on the part of the defendants, and whether or not it did so is our next question.
 
 
 10
 Our first problem is with the effect of the fact that the bonds had been called for redemption on May 1, 1944. By the time they came into the hands of these defendants in 1948, there were interest coupons attached to the bonds which, by their terms, were overdue. It appears that there was nothing on the face of these bonds to indicate that they had been called. Although there is no evidence that Parnell knew of the call, it is clear that the bank did. It also appears that the effect of the calling of the bonds was to stop the liability of the obligor to pay interest on them.[3]
 
 
 11
 Was this 'overdue paper'? If the paper was overdue on its face, the defendants did not acquire the bonds in good faith and would be liable for conversion under the same circumstances that one would be liable for conversion of any other chattel.
 
 
 12
 As said above, we think federal law controls the nature of the obligations embodied in these instruments. There is one Supreme Court decision which deals at length and thoroughly with the problem of the rights of one who acquires a called negotiable government bond for value, knowing of the call. That case is Morgan v. United States, 1885, 113 U.S. 476, 5 S.Ct. 588, 28 L.Ed. 1044, and we think it is controlling here. In Morgan, after discussing the reasons why the acceptance of overdue paper affects good faith, the Court said, 113 U.S. at pages 500-501, 5 S.Ct. at page 598:
 
 
 13
 'No such presumption, in our opinion, arises to affect the title of a holder of the bonds of the United States, such as those now in question, acquired by a bona fide purchaser for value prior to the date fixed in the bonds themselves for their ultimate payment; for, as we have already shown, the only change in the original effect of the contract by the exercise of the right of earlier redemption is to stop the obligation to pay future interest. And as against one choosing for any purpose of his own to retain his bond as a continuing security for the value it always represents, having impressed upon it by the law of its creation the faculty of passing from hand to hand as money, and therefore just as useful in the pursuits of trade and the exchanges of commerce and banking as so much money in the form of coin or bank-notes, and more convenient because more portable, no such presumption can be entertained on the ground that its continued circulation is not in the due course of business, that it has fully performed all its intended functions, and that it has been in any sense dishonored by a refusal on the part of the obligor to fulfill its obligation. On the contrary, supposing the purchaser bound to know, what in fact does not appear on its face, that the bond has been called for redemption under penalty of a stoppage of interest after three months, the very notice, which, it is said, discredits his title, is in fact an advertisement, not that the maker has any ground to refuse payment, but that the previous holder preferred to hold the security for the money rather than to accept the money which it represents.'
 
 
 14
 The Court did not think that the lapse of a long period between a call and a purchase affects the purchaser's rights, saying, 113 U.S. at pages 501-502, 5 S.Ct. at page 598:
 
 
 15
 '* * * In reference to the bonds involved in this litigation, we have no hesitation in saying that, at the time the title of the purchasers was acquired, no unreasonable length of time had elapsed after the maturity of the call. On the contrary, we think any holder had a right, without prejudice, except as to loss of interest, to wait without demand for the whole period, at the expiration of which the bond was unconditionally payable.
 
 
 16
 'The fact that interest was to cease to accrue three months after the date of call, had no tendency to discredit the bonds or affect the title of a bona fide purchaser for value in the due course of trade. * * *' (Emphasis supplied.)
 
 
 17
 The Morgan case has never been overruled, nor do we think that it has been diluted by Smyth v. United States, 1937, 302, U.S. 329, 58 S.Ct. 248, 250, 82 L.Ed. 294. In the Smyth case, the only question involved was, 'Was a notice of call issued by the Secretary of the Treasury for the redemption of Liberty Loan bonds effective to terminate the running of interest on the bonds from the designated redemption date?' Smyth held that the call terminated interest, and this decision is in full accord with Morgan. We do not think that the Smyth case should be read so as to impair the reasoning and decision in Morgan, especially since Smyth was not concerned with the Morgan problem, and nowhere is Morgan referred to in the Smyth opinion.
 
 
 18
 Thus, in the instant case, the facts that the bonds had been called and that the Indiana bank knew of the call cannot be considered evidence of bad faith. If the plaintiff is to prevail, it must be because there is other evidence, aside from the fact of call, which will sustain its burden of proving notice and bad faith.
 
 
 19
 As far as the Indiana bank is concerned, we do not think there was any evidence of bad faith. There is nothing in the evidence presented by the plaintiff to evidence bad faith on the part of the Indiana bank, but the plaintiff relies upon evidence which was elicited from defense witnesses. There was evidence that the Indiana bank paid Parnell in bills of small denominations, the largest being one hundred dollar bills. There was also evidence that when the Indiana bank received credit from the Federal Reserve Bank for the bonds, a cashier telephoned to inform Parnell that the bonds had been cashed. In all these transactions, according to the plaintiff, Parnell acted for an undisclosed principal. These facts are all that plaintiff can rely on to sustain its burden of proof. Accepting these facts as we have outlined them, we do not think they show any bad faith on the part of the Indiana bank.
 
 
 20
 But an examination of the record does not disclose that Parnell specifically asked for small denominations, and there is uncontradicted testimony by the cashier that the Indiana bank never carried on hand bills of a larger denomination than one hundred dollars. The evidence of small bills, of course, would be immaterial on the issue of good faith in accepting the first bonds. Even assuming the Indiana bank had larger bills and Parnell specifically requested small bills, the bank would not know this 'suspicious' circumstance until after it had given Parnell the cashier's check. As to the second transaction, we must remember that almost a month had passed since the first transaction without any notice from the Federal Reserve Bank or anyone else that the first bonds were stolen bonds. As for the telephone calls from the cashier, the record does not at all indicate that the calls were special calls made directly to Parnell personally in some secretive manner. In fact, the record indicates that Parnell's office received a call in September, when he was out of town, in connection with the cashing of certain bonds. In any event, it is difficult to see how a cashier's calls to a customer, who was also a director of the bank, awaiting payment of bonds indicates lack of good faith on the part of the Indiana bank. Many bank customers would demand such service.
 
 
 21
 In short, plaintiff failed to sustain its burden of proof so far as the Indiana bank was concerned.
 
 
 22
 As to Parnell, however, the story is different. There was evidence which, if believed, would sustain the jury's verdict that he acted in had faith. From Rocco's testimony, the jury could have inferred that Parnell's fee for cashing the bonds was extremely high, being approximately ten per cent of the value of the bonds. A fee of five or six thousand dollars for the mere transmittal of bonds for redemption would be sufficient evidence from which a jury could find bad faith.
 
 
 23
 But, even though there was evidence from which the jury could have found a lack of good faith on the part of Parnell, the jury's verdict cannot stand because of improper instructions. In its charge, the district court categorically told the jury that the burden of proving lack of notice and want of good faith was upon the Indiana bank and Parnell. As we have heretofore indicated, the burden of proof was upon the claimant-plaintiff. There is no doubt that the trial court was aware that it was Parnell's contention that federal law should govern the case and consequently the burden of proof was upon the plaintiff as to notice and good faith. As early as the pre-trial conference, the defendants vigorously asserted this, and they renewed their contention on various occasions during the trial. Under these circumstances, although no specific objection was voiced to the charge, we nevertheless can and will take note of such a fundamental error and reverse.
 
 
 24
 There is no need to consider other points raised by the defendants-appellants.
 
 
 25
 The plaintiff has also appealed in this case, claiming that the judgments should be increased to include interest from the time of the conversion by each defendant until the judgment was returned. The judge left the matter of interest to the jury's discretion. Three separate judgments were entered, each for $57,600, one against Rocco, one against Parnell, and one against the Indiana bank. Plaintiff's judgment against Rocco stands because Rocco has not appealed. As to the Rocco judgment, the plaintiff's request for interest must be rejected. The plaintiff cannot now complain about the judge's instructions to the jury concerning interest. It did not complain of the instruction when given. In fact, plaintiff acquiesced in it. Just after the judge had charged in the matter of interest, he asked counsel whether they desired additional instructions or correction in the instructions given. Plaintiff's counsel said he desired no additional instructions and 'has no correction.'
 
 
 26
 We think that the judge's instructions became the law of the case, and the plaintiff cannot now offer objection.
 
 
 27
 The interest question is moot re plaintiff's appeal from the judgments entered against Parnell and the Indiana bank, since those judgments will be reversed, but since the same problem may arise again, we note that, for reasons given earlier in this opinion, interest questions along with all other questions involving government bonds should be governed by federal rather than state law.
 
 
 28
 The judgment in No. 11,526 will be reversed, and the cause will be remanded with instructions that judgment be entered for the First National Bank in Indiana. In No. 11,536, the judgment will be reversed and the cause remanded with instructions that a new trial be granted to Parnell. In No. 11,533, the judgment against Rocco will be affirmed.
 
 
 29
 GOODRICH, Circuit Judge (dissenting).
 
 
 30
 There is a sharp distinction made in the law between the law which governs the nature of a contract, including its assignability, and the law which is looked to to determine whether a given transaction assigns the contractual rights. The latter question is determined by the law of place of assignment; the former by the place of contracting. See Restatement, Conflict of Laws, § 348 and following.
 
 
 31
 We think that analogy is in point here and marks the line where Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 is applicable and where it is not.
 
 
 32
 We think that the Clearfield Trust case has this much to do with the set of facts here and no more. This was a bond issued by the United States or by a government corporation under its authority. The nature of the obligation, we think, is controlled by United States law and the rights and duties of the United States as a party is a matter for federal legislation and regulations. We do not think that the rights of transferees among each other in a transaction taking place in Pennsylvania is a matter of federal law at all but is governed by the law of the state where the operative facts occurred. See Clearfield Trust Co. v. United States, supra, 318 U.S. at page 367, 63 S.Ct. 573. See also United States v. Guaranty Trust Co., 1934, 293 U.S. 340, 346, 55 S.Ct. 221, 79 L.Ed. 415.
 
 
 33
 Our analysis of the case, then, would proceed as follows:
 
 
 34
 I. Were These Bonds Overdue?
 
 
 35
 The first question in the case has to do with the effect of the fact that these bonds had been called for redemption on May 1, 1944. By the time they came into the hands of these defendants in 1948 there were interest coupons attached to the bonds which by their terms were overdue. It appears that there was nothing on the face of these bonds to indicate that they had been called. It also appears that the effect of the calling of the bonds was to stop the liability of the obligor to pay interest on them.[1]
 
 
 36
 Was this 'overdue paper'? If the paper was overdue, it is quite clear that there can be no such thing as a holder in due course[2] and that anyone who interferes with the rights of the true owner is liable for conversion under the same circumstances that he would be liable for conversion of any other chattel.[3] Overdue paper is 'negotiable' in the sense that it can be transferred, if bearer paper, by transfer of possession, if order paper, by endorsement and delivery, in the same way as if it were not overdue. But one acquires under those circumstances no special rights from the fact that he is dealing with negotiable paper except that if he takes from a person who is a holder in due course he succeeds to that person's rights. Of course, so does one who takes a chattel from another.[4]
 
 
 37
 As said above, we think federal law controls the nature of the obligation embodied in these instruments. There is one Supreme Court decision which deals at length and thoroughly with the problem of the rights of one who acquires a called negotiable bond for value and in good faith but shortly after the call has been made. That case is Morgan v. United States, 1885, 113 U.S. 476, 5 S.Ct. 588, 28 L.Ed. 1044. The Court there said that, 113 U.S. 498, 5 S.Ct. 596, 'the bond becomes, after the maturity of a call for redemption, payable at the option of the holder on demand, but without future interest * * * it cannot be that the legal effect of such a call for the purpose of redemption is the same as if the bond had been originally framed as an obligation to pay absolutely on a day previously fixed.'[5]
 
 
 38
 In Smyth v. United States, 1937, 302 U.S. 329, 58 S.Ct. 248, 82 L.Ed. 294, Mr. Justice Cardozo stated categorically that redemption clauses in Government bonds 'are provisions for the acceleration of maturity at the pleasure of the Government, and upon publication of the notice of call for the period stated in the bonds the new date became substituted for the old one as if there from the beginning.' 302 U.S. at page 353,[6] 58 S.Ct. at page 252.
 
 
 39
 To us it seems apparent that the language of the Supreme Court in 1937 differs quite materially from the language of the Supreme Court in 1885. If the Cardozo language is taken literally the bonds which we deal with in this case were certainly overdue at the time of their negotiation to the First National Bank in Indiana.
 
 
 40
 There is a further complication here. There is good authority which indicates that if one knows that negotiable instruments have been accelerated, they become, at least as to him, overdue instruments.[7] There is testimony in this case from the cashier of the Indiana bank that he knew these bonds had been called. If the authorities just cited are correct, then the bank knowingly took overdue instruments. But in the Morgan case the Court stated as a fact that the purchasers of the bonds knew that they had been called. And it is quite evident what the Court, through Mr. Justice Matthews, attached no significance to that fact. What would be held if the case came up today we have no way of knowing.[8]
 
 
 41
 But there is one further point, however, which we think is controlling. In the Morgan case the negotiation to the purchaser by the thief or one who held from him was within three months of the effective date of call. Does the time element make any difference? We think it does. Again reverting to language in the Smyth case and also language in the Morgan case, itself, we think this called bond became an instrument payable on demand at the option of the holder. Mr. Justice Matthews speaks of the instrument, after call, as 'a bond redeemable at the treasury on demand, without interest after the maturity of the call * * *.' Whether these bonds would be treated as 'demand instruments' as to someone who did not know of the call, we need not decide. But we refer again to the admissions of the cashier of the bank in Indiana. He knew that the bonds had been called. Certainly as to his bank these instruments became payable on demand at the option of the holder.
 
 
 42
 The rule for determining rights of purchasers of demand paper has been many times litigated.[9] A demand instrument circulates free from equities for a reasonable time. What is a reasonable time depends upon the nature of the paper, the usage of business with respect to such instruments and the facts of the particular case.[10] If the paper is currency it is hard to say when a reasonable time has passed. But a bond no longer bearing interest and with a batch of coupons calling for interest which have now become ineffective is hardly to be compared with a federal reserve note which one picks up as he cashes a check at a bank counter. In this case the bank in Indiana got these bonds about four and one-half years after the effective date of the call. We think that was not a reasonable time after they had become 'due' and that, therefore, the taker could not claim the rights of a holder in due course.[11]
 
 
 43
 II. The Proof of Good Faith and Burden Thereof.
 
 
 44
 It is true that the Indiana bank was not a purchaser of this paper in the sense that it bought it. But we do not think it helps the analysis of the problem to call the bank a mere 'conduit.' It was a 'holder' of the paper because it was in possession of an instrument payable to bearer.[12] There is no doubt, too, that both Parnell and the bank were persons to whom the instrument had been negotiated. Section 30 of the Negotiable Instruments Law, Pa.Stat.Ann. tit. 56, § 81 (1930) states:
 
 
 45
 'An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer, it is negotiated by delivery; if payable to order, it is negotiated by the indorsement of the holder, completed by delivery.'
 
 
 46
 Now we come to the provision of the law that contains the controlling language for this case. That is Section 59 of the Negotiable Instruments Law and here is the appropriate section as it appears in Purdon's:
 
 
 47
 ' § 139. Burden or proof when title is defective
 
 
 48
 'Every holder is deemed prima facie, to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. But the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title.' Pa.Stat.Ann. tit. 56, § 139 (1930).
 
 
 49
 See First National Bank of Blairstown v. Goldberg, 1941, 340 Pa. 337, 17 A.2d 377, where the section was applied.
 
 
 50
 In appellants' briefs there seem to be points made that the federal rule applies at this place and that if the federal rule applies the burden on the holder is different. We do not see any basis for this claim. We have already said that Pennsylvania law determines the rights acquired by transfer. But regardless of this the quoted section of the statute was a codification of the law merchant rule which had prevailed before the statute was passed. This is quite clear on the authorities. Canajoharie Nat. Bank v. Diefendorf, 1890, 123 N.Y. 191, 25 N.E. 402, 10 L.R.A. 676 (and cases cited therein); Keegan v. Rock, 1905 128 Iowa 39, 102 N.W. 805 (and cases cited therein); Parsons v. Utica Cement Co., 1909, 82 Conn. 333, 73 A. 785; Ireland v. Scharpenberg, 1909, 54 Wash. 558, 103 P. 801 (and cases cited therein); Campbell v. Cincinnati Fourth Nat. Bank, 1910, 137 Ky. 555, 126 S.W. 114. That being so, whether one goes to uncodified mercantile law or to codified statute the rule is just the same.
 
 
 51
 Now, to apply that rule to the situation in this case. Rocco was a holder. Parnell was a holder. Indiana bank was a holder. So must have been the person who took the bonds from plaintiff bank and passed them on. That person certainly had a defective title for he (or they) stole the bonds.[13] Therefore, under Section 59 of the statute, it was incumbent upon these defendants to show either that they or some person under whom they claimed held as a holder in due course and the rights of a holder in due course are described in Section 57 of the statute[14] and the qualifications for one to become a person in that happy situation are stated in Section 52.[15] That provision, as it appears in Purdon's, is also worth quoting.
 
 
 52
 ' § 132. Who is a holder in due course
 
 
 53
 'A holder in due course is a holder who has taken the instrument under the following conditions:
 
 
 54
 '1. That it is complete and regular upon its face.
 
 
 55
 '2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.
 
 
 56
 '3. That he took it in good faith and for value.
 
 
 57
 '4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.'
 
 
 58
 We are, therefore, in this situation. The instruments are shown to be stolen. Someone has them. We do not know who, nor do we know how they got to Rocco. We do know that Rocco turned them over to Parnell, Parnell to the bank in Indiana and that bank in turn to Federal Reserve in Cleveland. By the words of the statute the burden is on these people to establish their lack of notice of defective title.
 
 
 59
 The only thing that an appellate court needs to decide upon this question is whether the verdict of the jury, which necessarily found they did not establish their lack of notice, is a supportable verdict. Both the bank and Parnell claimed that they took the paper in ordinary course of business and the bank pointed out that all it got out of the transaction was a small fee for collection. Mr. Parnell likewise claimed to have made only a nominal amount for handling the collection for Rocco but his testimony was flatly contradicted by Rocco who was brought back from jail to testify and was not cross-examined by either of the other defendants.
 
 
 60
 As to Parnell, the testimony of Rocco, if the jury believed it (and after verdict we must take it that they did), was itself sufficient to cast very great suspicion upon the honesty of Parnell's claim of good faith. The language in which Rocco described the matter, too, was, again if his testimony was believed, enough to discredit good faith in the transaction. For example, when questioned about procedure, he said, 'Well, I can't answer that question truthfully either, as to whether he took his out or I gave him his * * *' The whole affair seemed to have been conducted without any record of any kind being made by either party.
 
 
 61
 There was this business, too, of the way in which the money was secured. The cashier of the bank, it was testified, telephoned to Mr. Parnell when the credit was received from Federal Reserve Bank, and Parnell got a cashier's check for the amount right away and immediately proceeded to cash it and get the money in small bills. This was done with the two batches of bonds here concerned and with another batch of bonds which had been cashed a little bit earlier. Now, of course, there is nothing against the law in a man getting a check cashed in any form he wants it. But it does seem a little unusual to have even a lawyer who does business for clients in three transactions get several thousands of dollars worth of small bills. At least twelve reasonable jurors might raise their eyebrows at this. The facts do not tend to show the regularity and good faith of the transaction, the 'ordinary course of business' aspect of the things the parties were doing. Furthermore, the jury saw the witnesses.
 
 
 62
 As to Mr. Parnell, the point discussed earlier in this opinion with regard to a called bond becoming demand paper does not apply. There is nothing to show that Mr. Parnell knew the bonds had been called and he, himself, denied it. The verdict for the plaintiff, as to him, rests on the fact that the jury's finding that the burden of proving good faith had not been sustained is a verdict which is sufficiently supported by the evidence.
 
 
 63
 Now as to the bank, if we are right in saying that the bank was a taker of demand paper an unreasonable length of time after the maturity had been advanced by the call, the bank is clearly liable. Even without that, however, there is enough here to let the verdict stand although the evidence is not so strong against the bank as it is against Mr. Parnell.
 
 
 64
 We think the circumstances surrounding this negotiation were such as to arouse some suspicion. These two batches of bonds and one other before had been collected by the bank on behalf of Mr. Parnell. Notification was given him by telephone by the same bank officer each time. He received a cashier's check each time and proceeded to cash it into currency each time. With regard to the bonds here involved the bank took them, knowing they were called, with unpaid coupons, eight in number, attached to them. And these coupons, as already has been explained, do not call for the payment for money since the call cancelled the obligation to pay interest.
 
 
 65
 When one goes back to the earlier cases which talk about overdue paper, one of the things which is stressed is the fact that this overdue paper is not the kind of thing which is circulating in the channels of commerce; that the fact it is still around after its maturity shows something, not criminal, but not in due course of business either. We think that the taking of such paper as that involved here is not the ordinary course of business kind of thing which one would expect to be done. Or, if that is too strong, the fact that it was so taken does not help the party with a burden of establishing his good faith to show it.
 
 
 66
 We conclude that as to both the defendant, Parnell, and the bank, there is sufficient evidence to justify the jury's finding against them in view of the burden which they had under the law.
 
 
 67
 III. Objections to Exhibits.
 
 
 68
 There were certain exhibits to which objection was made. These consisted of a notice sent out by the Federal Reserve Bank of San Francisco to the Pittsburgh Branch, Federal Reserve Bank of Cleveland, notices of claim of loss from the plaintiff bank addressed to the Pittsburgh Branch of the Federal Reserve Bank of Cleveland, a copy of a notice circulated by the Federal Bureau of Investigation in the area of the Pittsburgh Branch of the Federal Reserve Bank of Cleveland. It is not claimed that any of these reached the Indiana bank so as to charge it with the knowledge which these notices contained. The judge limited their use to the establishment of the loss by the plaintiff and that notices of the loss went out through banking channels.[16] This was not error. The analogy of the 'hue and cry' immediately suggests itself. And we think that the fact of a notice being broadcast in the bank's vicinity is admissible on the question of whether the bank may have had some knowledge. But, in view of the limitation placed by the judge upon the evidence we need not decide this.
 
 
 69
 IV. Joint and Several Tortfeasors.
 
 
 70
 The defendant bank also asked for an instruction to the effect that the plaintiff could not have a verdict against more than one of these alleged converters. This instruction was refused and it claims error. We think the bank is incorrect. The general rule with regard to the liability of several persons in such an action as this is that the satisfaction of the judgment against one precludes proceeding against another. This is the rule as it appears in the Restatement of Torts, § 249, and this is the rule as it is generally applied in Pennsylvania. Union of Russian Societies of St. Michael & St. George, Inc., v. Koss, 1944, 348 Pa. 574, 36 A.2d 433. There is some early authority in Pennsylvania that seems to indicate in actions for conversion that the securing of a judgment against one alleged tort-feasor has the same effect. See, e.g., Hyde v. Kiehl, 1898, 183 Pa. 414, 38 A. 998. These cases are not new and the authorities above cited announce the present-day rule. Whether the older cases represent the present law of Pennsylvania is doubtful. See Goodrich-Amram, Procedural Rules Service, §§ 2229(b), 2232(f), 2232(f)-1 (1940). But even then they do not go so far as to preclude a verdict against more than one defendant. It might well be, if they were still effective, that a plaintiff would have to elect, before judgment was entered, which defendant he wanted to pursue. There is, we conclude, no merit in this point made by the defendant.
 
 
 71
 The appellants have raised other points but there is no merit in them and they do not require discussion. We agree with the majority on the matter of interest.
 
 
 72
 Our view of the case would require affirmance in 11,516, 11,533 and 11,536.
 
 
 73
 KALODNER, Circuit Judge, authorizes me to state that he concurs with the views expressed in the foregoing dissent.
 
 
 74
 McLAUGHLIN, Circuit Judge (dissenting).
 
 
 75
 I agree with the views expressed by Judge GOODRICH in his dissent.
 
 
 
 [1]
 There were actually two such transactions, one in September, 1948, and the other in October, 1948
 
 
 [2]
 Rocco was also prosecuted criminally and was convicted for transporting in interstate commerce and for selling stolen securities. See United States v. Rocco, D.C.W.D.Pa.1951, 99 F.Supp. 746, affirmed per curiam, 3 Cir., 1952, 193 F.2d 1008
 
 
 [3]
 31 Code Fed.Regs. § 307.4 (1949). 'Interest. Bonds and other interest-bearing securities will cease to bear interest on the date of their maturity, unless they have been called for redemption before their maturity in accordance with their terms, in which case they will cease to bear interest on the date fixed for redemption in the call. No interest can accrue after a security has become due and payable, whether at maturity or by virtue of a call for redemption before maturity.'
 
 
 [1]
 31 C.F.R. § 307.4 (1949). 'Interest. Bonds and other interest-bearing securities will cease to bear interest on the date of their maturity, unless they have been called for redemption before their maturity in accordance with their terms, in which case they will cease to bear interest on the date fixed for redemption in the call. No interest can accrue after a security has become due and payable, whether at maturity or by virtue of a call for redemption before maturity.'
 
 
 [2]
 Negotiable Instruments Law § 52 subd. 2, Pa.Stat.Ann. tit. 56, § 132 subd. 2 (1930). We cite the Pennsylvania statute as it existed before the adoption of the Uniform Commercial Code in this State. Our operative facts here occurred in 1948
 
 
 [3]
 Negotiable Instruments Law § 58, Pa.Stat.Ann. tit. 56, § 138 (1930); Britton, Bills and Notes, § 155 (1943); Lindsley v. First Nat. Bank of Philadelphia, 1937, 325 Pa. 393, 190 A. 876; Kittredge v. Grannis, 1926, 244 N.Y. 168, 155 N.E. 88
 
 
 [4]
 Negotiable Instruments Law § 58, Pa.Stat.Ann. tit. 56, § 138 (1930); Chafee, Rights in Overdue Paper, 31 Harv.L.Rev. 1104, 1110 (1918); Britton, supra, § 123 (1943)
 
 
 [5]
 The Court concluded that the bonds were 'not overdue, in the commercial sense, till (sic) after the day of unconditional payment.' 113 U.S. at page 499, 5 S.Ct. at page 597. The Morgan case was cited and followed in Pflueger v. Broadway Trust & Savings Bank, 1931, 265 Ill.App. 569, 595. The Supreme Court of Illinois affirmed the decision on appeal on the basis of the Morgan case, but also pointed out that there was no evidence of notice of the call for redemption. 1932, 351 Ill. 170, 184 N.E. 318
 
 
 [6]
 See also Britton, supra, § 23 (1943) ('From the business standpoint the accelerating clause is used for two purposes: (1) to permit the obligor to pay the instrument before the arrival of the ultimate date of maturity, or (2) * * * The former is well illustrated by the redeemable or callable bond and promissory notes of like nature.'); Beutel's Brannan Negotiable Instruments Law, 277 (7th ed., 1948) ("This bond is subject to redemption at 105' does not render the instrument non-negotiable; it is a mere acceleration clause.' Citing Sturgis Nat. Bank v. Harris Trust & Savings Bank, 1933, 351 Ill. 465, 184 N.E. 589, which only holds that a redemption clause does not make the instrument non-negotiable.); Bank of California v. National City Co., 1926, 138 Wash. 517, 244 P. 690, 693 (A redemption clause 'has no other legal effect in this respect than to make the bonds mature 'on or before' the fixed final date of maturity * * *.'); Lann v. United Steel Works Corp., 1938, 166 Misc. 465, 1 N.Y.S.2d 951, 956 ('The notice of redemption * * * simply served to accelerate the date of payment.')
 
 
 [7]
 Britton, supra, § 121 (1942); Aigler, Cases on Bills and Notes, 587 (1947); Beutel's Brannan, supra, 697-698 (and cases collected therein). But see Chafee, Rights in Overdue Paper, 31 Harv.L.Rev. 1104 (1918)
 
 
 [8]
 The modern commercial view upon the subject is expressed in Section 8-305 of the Uniform Commercial Code, Pa.Stat.Ann. tit. 12A, § 8-305 (1954), which provides as follows:
 ' § 8-305. Staleness as Notice of Claims of Ownership.
 'An act or event which creates a right to immediate performance of the principal obligation evidenced by the security or which requires that the security be presented or surrendered for redemption or exchange does not of itself constitute any notice of claims of ownership except in the case of a purchase
 '(a) after one year from any date set for a required presentment or surrender for redemption or exchange; or
 '(b) if funds are available for payment, after six months from any date set for payment of money against presentation or surrender of the security.'
 
 
 [9]
 Negotiable Instruments Law, § 53, Pa.Stat. Ann. tit. 56, § 133 (1930); Beutel's Brannan, supra, 716-721 (and cases collected therein)
 
 
 [10]
 Negotiable Instruments Law, § 193, Pa.Stat.Ann. tit. 56, § 494 (1930)
 
 
 [11]
 Beutel's Brannan, supra, 716-718, 1344-1347
 
 
 [12]
 Negotiable Instruments Law, § 191, Pa.Stat.Ann. tit. 56, § 492 (1939)
 
 
 [13]
 Negotiable Instruments Law, § 55, Pa.Stat.Ann. tit. 56, § 135 (1930)
 
 
 [14]
 Pa.Stat.Ann. tit. 56, § 137 (1930)
 
 
 [15]
 Pa.Stat.Ann. tit. 56, § 132 (1930)
 
 
 [16]
 In reference to these exhibits the Court said: 'I have admitted those prior exhibits, in accordance, as I understand, with plaintiff's theory, that the bonds disappeared from the bank, not in the ordinary course of business, but in effect that they were stolen, that they gave notice, that they acted as a person who had lost some property. And through banking channels, the proper notices were given
 'Now, the question is, it isn't necessarily conclusive on your man, your bank, as to whether they got it or whether they didn't. But notices went out through banking channels. If he wants to bring that home to you, that is up to him.'
 'The limitations on the use of these exhibits were explained to the jury on at least two occasions during the course of the trial.